**Opinion issued July 25, 2023**



**In The**

# Court of Appeals

**For The**

# First District of Texas

_____

## NO. 01-20-00578-CV
_____

**JOAN GOTTLIEB MENDELL, INDIVIDUALLY AND IN HER CAPACITY AS TRUSTEE OF THE MK TRUST NO. 2, Appellant**

**V.**

**LAURENCE SCOTT AND RACHEL CHAPUT, Appellees**

---

**On Appeal from the Probate Court No. 1**
**Harris County, Texas**
**Trial Court Case No. 475348**

---

## MEMORANDUM OPINION

Appellant Joan Gottlieb Mendell (Mendell) is the trustee of the MK Trust No. 2 (the Trust). In April 2019, appellees, Laurence Scott (Laurence) and Rachel Chaput (Rachel), who are Mendell's nephew and niece, filed suit against Mendell in her individual and representative capacities, seeking declaratory relief that they were

the sole beneficiaries of the Trust and that the Trust had terminated by its terms, and alleging that Mendell had breached her fiduciary duty by failing to wind up the Trust and distribute the Trust assets to them. Appellees sought actual and exemplary damages for appellant's alleged breaches of fiduciary duties, declaratory and injunctive relief, and attorney's fees. The trial court granted three partial summary judgments in favor of appellees on their requests for declaratory relief, and the case proceeded to trial on the breach of fiduciary duty issues.

A jury returned a verdict in favor of appellees, and the trial court signed a final judgment declaring appellees beneficiaries of the Trust, which had terminated, and awarding $715,792.21 in damages and attorney's fees against appellant in her individual capacity. The trial court also entered permanent injunctive relief against appellant in her individual and representative capacities.

On appeal, Mendell challenges: (1) the trial court's partial summary judgment orders, (2) the monetary and injunctive relief awarded against Mendell in her individual capacity, (3) the sufficiency of the evidence supporting the actual and exemplary damages awards, (4) the trial court's permanent injunction, and (5) the award of attorney's fees against Mendell in her individual capacity.

We affirm in part and reverse and remand in part.

## Background

On February 28, 2017, Maurice Kroll (known by his family as Uncle Mutt), who was not married and had no children, executed his Last Will and Testament (the Will) and three trust agreements creating the MK Trust No. 1, the MK Trust No. 2, and the MK Trust No. 3. Each of these trusts benefitted Uncle Mutt during his lifetime but had different beneficiaries upon his death. The MK Trust No. 1 benefitted his niece Mendell (the appellant in this appeal). The MK Trust No. 2 benefitted his niece Susan Edis Gottlieb Herzfeld (Susan). Appellees are Susan's adult children. The MK Trust No. 3 benefitted Jerome Michael Schneider and Michelle Alyse Schneider, the children of his previously deceased niece, Ronnie Jean Gottlieb Schneider.

Mendell is the sole trustee of all three trusts. The issues in this appeal relate only to MK Trust No. 2 (the Trust).

Under the Will and the various trust agreements, Uncle Mutt's residuary estate was to be split into thirds, with one-third going to each respective trust. Uncle Mutt had concerns, based upon Susan's past conduct, that she might "question the handling of [his] affairs, the provision of care for his benefit during the remainder of his lifetime, who should be the guardian of his estate and of his person if such need would arise, the probate of his estate, and/or matters covered under this Trust Agreement, the trust agreement of the MK Trust No. 1 and/or the trust agreement of

3

the MK Trust No. 3, including the selection of trustees." Accordingly, under the terms of the agreement establishing the Trust, specifically Section 6.2, upon Uncle Mutt's death, one-third of his residuary estate was to go to Susan, in trust, provided that she, individually or with other members of her family, including appellees, had not committed any of 33 various "Prohibited Acts" defined and set out in the Trust.

In the event that Susan predeceased Uncle Mutt, and conditioned upon no Prohibited Act having occurred, Section 6.2 of the Trust agreement further provided that the remaining assets of the Trust "shall be distributed to [Susan's] children, Laurence Scott (Herzfeld) and Rachel Chaput, in equal shares, outright and free of trust . . . conditioned upon, and provided that, neither any Laurence Scott Party (as defined in Section 6.6), with respect to any share going to Laurence Scott (Herzfeld), nor any Rachel Chaput Party (as defined in Section 6.6), with respect to any share going to Rachel Chaput, have previously committed a Prohibited Act (as defined below in Section 6.4) after the Effective Date (as defined in the first paragraph of this Trust Agreement)."

Uncle Mutt died on June 8, 2017, in Harris County, Texas at age 97. Uncle Mutt's Will was admitted to probate and Mendell was appointed as Independent Executor in 2017. Additionally, upon Uncle Mutt's death, Mendell became the trustee of the Trust.

On August 17, 2017, two months after Uncle Mutt's death, Mark. C. Watler, representing Mendell as Trustee of the Trust, sent Susan a letter (the August 17 letter) explaining the terms of the Trust and describing some of the family history and disputes giving rise to the conditions of the Trust. In this letter, Watler informed Susan that "your sister, [Mendell] acting as Trustee of the MK Trust No. 2, has determined in her sole discretion that you have not committed a Prohibited Act since the Effective Date of the Trust Agreement. Therefore, the distribution plan that comes into play, to be implemented at this time (following your uncle's death), is the one described in Paragraphs 6.2 (at page 6) and 8.2 (at page 24), and the remaining trust assets are to be conveyed to the new Susan Edis Gottlieb Herzfeld Trust, with one of the institutional Trustees nominated in Paragraph 9.1 (at page 26) to serve as Trustee[.]" In connection with this distribution plan, Watler explained that Susan's "assurances that [she] w[ould] be fully cooperative and that [she] was not a litigation risk" were needed in order to transition the assets from the Trust to Susan's trust with a corporate trustee, and requested that Susan respond to the letter by September 15.

Approximately a month after receiving the August 17 letter, on September 27, Susan executed a disclaimer of her interest in the Trust (the Disclaimer). In her Disclaimer, Susan stated that because she was disclaiming her interest in the Trust, she was to be treated as having predeceased Uncle Mutt such that the "Trust

provisions governing the flow of assets in the event of the prior death of the Disclaimant shall control." In a letter addressed to Mendell and attached to the Disclaimer, Susan explained that she wanted to honor Uncle Mutt's wishes "for his nieces to reconcile and find a path forward together in life that wasn't steeped in bad feelings and resentment or involve lawyers and legal expenses." Susan stated that she felt the best way to do her "part in rebuilding our relationship as sisters" was "to remove money from our relationship entirely."

Although Uncle Mutt passed away in August 2017, between his death and February 2018, Mendell did not make any distributions of the assets in the Trust to any purported beneficiaries, nor did she communicate with Laurence or Rachel. Around February 2018, Laurence and Rachel set up investment accounts to receive the Trust assets and communicated, through their financial advisor, with Mendell and her attorney regarding these investment accounts.

Later, after not receiving any distributions or communications from Mendell, in August 2018, Rachel began emailing Mendell regarding the status of the distribution of the Trust. Between August 2018 and January 2019, Rachel sent Mendell eleven emails requesting an update on the Trust, asking when it would be finalized and distributions would be made, and requesting an accounting. Mendell responded four times throughout this period, stating either that she "ha[d] been working on a way to take care of the situation," that she would get back to Rachel

soon, that attorneys for the Trust would handle all communications with appellees, or that an accountant had been engaged to provide an accounting.

After still not receiving any distributions under the Trust, in April 2019, Laurence and Rachel filed this lawsuit to enforce their rights under the Trust. Laurence and Rachel requested declaratory relief that:

1. Susan's Disclaimer was valid and effective,

2. The Trust had terminated and appellees were the legal owners of the Trust property;

3. Because the Trust had terminated, it was impossible to commit a Prohibited Act because the legal and beneficial interests of the Trust merged to appellees;

4. Even if Prohibited Acts still applied, appellees' suit against Mendell and Susan's Disclaimer was not a Prohibited Act;

5. Appellees were present beneficiaries of the Trust; and

6. Mendell immediately wind up the Trust in accordance with the terms of the Trust Agreement by distributing any remaining assets to appellees free and outright of trust.

Appellees also brought causes of action for breach of fiduciary duty based on Mendell's failure to distribute the assets to appellees and wind up the Trust. In subsequent amended petitions, appellees included an application for a permanent injunction under section 114.008(a) of the Property Code, seeking to permanently enjoin Mendell from paying herself Trustee compensation or using Trust assets to pay her attorney's fees, and asked the trial court to order Mendell to wind up the Trust, distribute all Trust assets to them, and provide a final accounting.

7

Mendell counterclaimed to enforce the Trust's terms, conditions, and purposes, and asserted cross-claims against all alternative beneficiaries to determine distributions. Mendell also pleaded for the right to reimbursement from the Trust for all attorney's fees and expenses she incurred.

In August 2019, appellees filed the first of three motions for partial summary judgment. Appellees' first motion sought traditional summary judgment on three of their requests for declaratory relief and on Mendell's counterclaim. On February 7, 2020, the trial court granted appellees' motion and ordered that:

- Susan's Disclaimer was not a "Prohibited Act" under the terms of the Trust Agreement;

- Susan had an absolute right as a matter of law to disclaim her interest in the Trust; and

- Because Susan disclaimed her interest in the Trust, appellees were the sole present beneficiaries of the Trust.

Appellees' second and third motions hinged on those rulings, and sought traditional summary judgment on appellees' other requests for declaratory relief that:

- "Because the Trust has terminated, it is impossible to commit a Prohibited Act because the legal and beneficial interests have merged to Petitioners."

- "[T]he MK Trust No. 2 ('Trust') has terminated according to its terms."

On July 23, 2020, the trial court signed orders granting both motions. The trial court found that the Trust had terminated according to its terms, and that because the

8

Trust has terminated, it was impossible to commit a "Prohibited Act" because the legal and beneficial interests merged to appellees.

The case went to trial before a jury in October 2020. At the conclusion of trial, the jury came to a unanimous verdict that found Mendell breached her fiduciary duty in five different ways and awarded damages and attorney's fees to Laurence and Rachel. The jury also unanimously found that Mendell breached her fiduciary duty with malice and assessed exemplary damages against Mendell. Upon receipt of the verdict and after consideration of the evidence at trial, the trial court entered a permanent injunction. After several post-judgment motions, the trial court rendered judgment on the jury verdict (the Final Judgment) and modified the permanent injunction (the Modified Permanent Injunction). In the Modified Permanent Injunction, the trial court ordered Mendell to:

1. wind up the Trust within 30 days of the date of the Order and distribute all assets of the Trust to appellees;

2. return to the Trust any trustee compensation which Mendell paid herself for serving as the Trustee from funds or property belonging to the Trust;

3. restore and return to the Trust any attorney's fees paid with funds or property belonging to the Trust; and

4. provide a final accounting to appellees within 30 days.

The trial court also enjoined Mendell from selling, spending, or otherwise dissipating in any way any assets belonging to the Trust and ordered that Mendell be denied compensation for serving as the Trustee.

## Partial Summary Judgment

In her first issue, Mendell challenges the trial court's three pretrial orders granting partial summary judgment in favor of appellees on their declaratory judgment claims. In the first order, the trial court concluded that: (1) Susan's Disclaimer was not a "Prohibited Act" under the terms of the Trust Agreement; (2) Susan had an absolute right as a matter of law to disclaim her interest in the Trust; and (3) Because Susan disclaimed her interest in the Trust, appellees were the sole present beneficiaries of the Trust. In the second order, the trial court concluded that "[b]ecause the Trust has terminated, it is impossible to commit a Prohibited Act because the legal and beneficial interests have merged to Petitioners." Finally, in the third order, the trial court concluded that "[t]he MK Trust No. 2 ('Trust') has terminated according to its terms."

### A. Standard of Review

Declaratory judgments are reviewed under the same standards applicable to other judgments; thus, the denial or grant of a declaratory judgment requested through a traditional motion for summary judgment, as occurred here, is reviewed under traditional summary-judgment standards. *Unocal Pipeline Co. v. BP Pipelines (Alaska) Inc.*, 512 S.W.3d 492, 499 (Tex. App.—Houston [1st Dist.] 2016, pet. denied); *see also* TEX. CIV. PRAC. & REM. CODE § 37.010 ("All orders, judgments, and decrees under this chapter may be reviewed as other orders, judgments, and

decrees."). We review a traditional summary judgment de novo. *Provident Life & Accident Ins. Co. v. Knott*, 128 S.W.3d 211, 215 (Tex. 2003).

A party moving for traditional summary judgment bears the burden of proving that no genuine issues of material fact exist on at least one essential element of the cause of action asserted and that it is entitled to judgment as a matter of law. TEX. R. CIV. P. 166a(c); *Lightning Oil Co. v. Anadarko E&P Onshore, LLC*, 520 S.W.3d 39, 45 (Tex. 2017). A matter is conclusively established if reasonable people could not differ as to the conclusions to be drawn from the evidence. *See City of Keller v. Wilson*, 168 S.W.3d 802, 816 (Tex. 2005). If the movant meets its burden, the burden then shifts to the nonmovant to raise a fact issue precluding summary judgment. *See Centeq Realty, Inc. v. Siegler*, 899 S.W.2d 195, 197 (Tex. 1995).

We also review de novo the trial court's legal conclusions on the construction of trusts. *See Gamboa v. Gamboa*, 383 S.W.3d 263, 273 (Tex. App.—San Antonio 2012, no pet.). We similarly ascertain a trust grantor's intent from the language contained in the trust's four corners and focus on the meaning of the words actually used, not what the grantor intended to write. *Soefje v. Jones*, 270 S.W.3d 617, 628 (Tex. App.—San Antonio 2008, no pet.). We must interpret a trust to give meaning to all its provisions and to enact the intent of the grantor. *See Hurley v. Moody Nat'l Bank of Galveston*, 98 S.W.3d 307, 310 (Tex. App.—Houston [1st Dist.] 2003, no pet.).

11

## B. First Partial Summary Judgment

In appellees' first partial summary judgment, they moved for declaratory judgment as a matter of law that:

1. Susan's Disclaimer was not a "Prohibited Act" under the Trust;

2. Susan had an absolute right as a matter of law to disclaim her interest in the Trust; and

3. Because Susan disclaimed her interest in the Trust, appellees were the sole present beneficiaries of the Trust.

In support, appellees argued that the language of the Trust did not expressly prohibit disclaimer and, even if it did, a beneficiary has an absolute right to disclaim an interest in property. Because appellees contend the only Prohibited Act alleged by Mendell was Susan's Disclaimer, they argue they were the sole beneficiaries under the language of Section 6.2 of the Trust. The trial court agreed and granted summary judgment on each of the three requests for declaratory relief above.

Mendell argues that Susan's Disclaimer, as well as her actions surrounding the Disclaimer (i.e., her letter to Mendell that was attached to the Disclaimer), were Prohibited Acts under the Trust. She also argues that even if Susan's Disclaimer was valid and effective, the trial court still erred in granting summary judgment because the trial court misinterpreted Section 6.2 of the Trust Agreement to delete an express condition precedent to appellees' entitlement to distribution: Mendell's determination in her sole discretion that neither Susan nor appellees had committed a "Prohibited Act" after the Trust Agreement's effective date. She further argues that

12

she did not have to allege or present evidence of a specific Prohibited Act that was committed by either Susan or appellees to defeat summary judgment; it was appellees' burden to seek summary judgment that neither Susan nor appellees committed any of the 33 "Prohibited Acts" enumerated in the Trust. Because they failed to do so, summary judgment was improper.

To determine whether the trial court properly granted appellees' first partial summary judgment, we begin with the language of the Trust. We first consider whether the trial court properly concluded that Susan's Disclaimer was not a Prohibited Act.

Section 6.2 of the Trust, entitled "Conditional Disposition of Remaining Trust Assets to Susan Herzfeld Trust; No Prohibited Act," provides:

> Conditioned upon no Prohibited Act (as defined below in Section 6.4) being attributed to the share of the trust estate provided for under this Section 6.2 (see Section 6.6(a) below),[1] the remaining trust assets of

---

[1] Section 6.6(a) of the Trust states:

> A Prohibited Act (as defined in Section 6.4 above) shall be attributed to the Susan Herzfeld Share (as defined above in Section 6.2) if it is committed by any one or more of the following parties (herein referred to as "Susan Herzfeld Parties"): (i) Susan Edis Gottlieb Herzfeld, (ii) if married, the spouse of Susan Edis Gottlieb Herzfeld, (iii) if divorced, any ex-spouse of Susan Edis Gottlieb Herzfeld, (iv) Laurence Scott (Herzfeld), (v) Rachel Chaput, (vi) any spouse or ex-spouse of Laurence Scott Herzfeld), (vii) any spouse or ex-spouse of Rachel Chaput, (viii) any natural born or adopted child of Laurence Scott (Herzfeld), or any legal guardian of any such child, (ix) any natural born or adopted child of Rachel Chaput or any legal guardian of any such child, (x) any immediate family member of any spouse or ex-spouse of Laurence Scott (Herzfeld), (xi) any immediate

13

the MK Trust No. 2 (the "Susan Herzfeld Share") shall be distributed for the benefit of Settlor's niece, Susan Edis Gottlieb Herzfeld, currently residing in Dallas, Texas, in trust, pursuant to the provisions of Section VIII below and other applicable provisions of this Trust Agreement.

Section 6.4 defines 33 Prohibited Acts, many of which relate to acts that were prohibited during Uncle Mutt's lifetime, such as initiating or challenging guardianship proceedings, challenging Uncle Mutt's guardian or power of attorney appointments, and interfering with Uncle Mutt's medical care. The rest relate to various actions, including, for example: (1) attempting to interfere with control by Uncle Mutt's fiduciaries of the Trust, estate, or payable on death (POD) financial accounts, (2) challenging the validity of any of the MK Trust Agreements or the Will, (3) challenging the trustee or executor appointments under the MK Trust Agreements or the Will, and (4) initiating or joining in lawsuits or other proceedings against Uncle Mutt's appointed fiduciaries for allegations of tortious behavior or criminal acts. None of the 33 Prohibited Acts specifically mention or prohibit a beneficiary or other party from disclaiming or otherwise refusing to accept an interest in property under the Trust.

---

family member of any spouse or ex-spouse of Rachel Chaput, (xii) Trudy Cohen, (xiii) Howard Cohen and (xiv) anyone acting in concert with or at the direction of Susan Edis Gottlieb Herzfeld and/or any of the other aforementioned parties in this paragraph, including, without limitation, relatives, friends, attorneys, accountants, other professionals and healthcare providers.

In supplemental letter briefing following oral argument, Mendell clarified her argument that by filing her Disclaimer and not responding to Mendell's request for cooperation in the August 17 letter from Mendell's attorney, Susan committed an act prohibited by Section 6.4(33), which prohibits Susan (and others) from

> initiating, causing, joining in, and/or participating in any other troublesome action not already enumerated, other than in cooperation with the Trustee . . . that results in the incurrence of expenses or other costs of $5,000 or more to be borne by any of Settlor, any Settlor Trust, the Settlor Estate, and/or any Settlor Designated Representative, relating to any matter pertaining to Settlor, any Settlor Trust, and/or the Settlor Estate.

Even if we interpreted this language or any other in the list of Prohibited Acts as prohibiting the Disclaimer itself, Texas law is clear, and the trial court correctly concluded in its order, that a beneficiary has an absolute right to disclaim an interest in property and that right cannot be limited by the settlor. Section 240.006 of the Texas Property Code states:

> (a) A person other than a fiduciary may disclaim, in whole or in part, any interest in or power over property, including a power of appointment.

> (b) A person other than a fiduciary may disclaim an interest or power under this section even if the creator of the interest or power imposed a spendthrift provision or similar restriction on transfer or a restriction or limitation on the right to disclaim.

TEX. PROP. CODE § 240.006; *cf. Parks v. Parker*, 957 S.W.2d 666, 670 (Tex. App.—Austin 1997, no pet.) (interpreting former provision of probate code that allowed any person to disclaim any property he is entitled to receive from decedent's estate

as providing "absolute right to disclaim the property"); *see also Dyer v. Eckols*, 808 S.W.2d 531, 535 (Tex. App.—Houston [14th Dist.] 1991, writ dism'd by agr.) (noting that courts have taken position that creditor cannot prevent debtor from disclaiming inheritance and declining to invalidate a disclaimer under the fraudulent transfer act). Thus, under the terms of the Trust and the Texas Property Code, Susan's Disclaimer was effective and not a Prohibited Act.

The effect of Susan's Disclaimer was that it was to relate back to the time of the decedent's death (June 8, 2017) and Susan was to be treated as having predeceased Uncle Mutt. Section 240.051(b) of the Property Code provides:

> If an interest in property passes because of the death of a decedent . . . a disclaimer of the interest . . . takes effect as of the time of the decedent's death; and . . . relates back for all purposes to the time of the decedent's death.

TEX. PROP. CODE § 240.051(b). Further, "if the interest is passing because of the death of a decedent, the disclaimed interest passes as if the disclaimant had died immediately before the time as of which the disclaimer takes effect under Subsection (b)," i.e., the decedent's death. *Id.* § 240.051(e)(2)(A).[2] Because the effect of the Disclaimer meant that Susan predeceased Uncle Mutt, and the Disclaimer "relates

---

[2]     *See also* TEX. PROP. CODE § 240.051, NCCUSL cmt. ("The general rule is that the disclaimed interest passes as if the disclaimant had died immediately before the time of distribution."); *id.* Example 1(c) ("T's will devised 'ten thousand dollars ($10,000) to my brother, B, but if B does not survive me, to my children.' If B disclaims the devise, he will be deemed to have predeceased T and the alternative gift to T's children will dispose of the devise.").

16

back for all purposes to the time of the decedent's death," then Susan could not have committed a Prohibited Act, including by any of her actions surrounding the Disclaimer, after Uncle Mutt's death on June 8.

This leads us to the third conclusion in the trial court's first summary judgment order, i.e., that because Susan disclaimed her interest in the Trust, appellees were the sole present beneficiaries of the Trust. The second portion of Section 6.2 of the Trust provides for a disposition of the remaining assets of the Trust, if Susan did not survive Uncle Mutt:

> "If the said **Susan Edis Gottlieb Herzfeld does not survive Settlor**, and, again, **conditioned upon no Prohibited Act** (as defined below in Section 6.4) **having been attributed to the Susan Herzfeld Share** (see Section 6.6(a) below), then, instead, **the Susan Herzfeld Share** (see Section 6.6(a) below) **shall be distributed to [Susan's] children, Laurence Scott (Herzfeld) and Rachel Chaput, in equal shares, outright and free of trust** . . . conditioned upon, and **provided that, neither any Laurence Scott Party** (as defined in Section 6.6), with respect to any share going to Laurence Scott (Herzfeld), **nor any Rachel Chaput Party** (as defined in Section 6.6), with respect to any share going to Rachel Chaput, **have previously committed a Prohibited Act** (as defined below in Section 6.4) after the Effective Date (as defined in the first paragraph of this Trust Agreement)."

(Emphasis added).

Thus, for the Trust to be distributed to appellees "outright and free of trust," several conditions must be met:

1. Susan does not survive Uncle Mutt;

2. No Prohibited Act has been attributed to the Susan Herzfeld Share; and

3. Neither Laurence nor Rachel have "previously committed a Prohibited Act."

As noted above, the effect of Susan's Disclaimer was that she predeceased Uncle Mutt; thus, the portion of this provision requiring Susan to "not survive Settlor" is satisfied.

The provision further provides that disposition is "conditioned upon no Prohibited Act . . . having been attributed to the Susan Herzfeld Share" and requiring that neither Laurence nor Rachel had "previously committed a Prohibited Act." As explained, Susan's Disclaimer, as a matter of law, is not a Prohibited Act under the language of the Trust and under Texas law. And Mendell's own summary judgment evidence offered in support of her opposition demonstrates that she had determined, as of August 17, 2017, that no Prohibited Act had occurred, and the remaining Trust assets were going to be distributed into a new trust for Susan in accordance with the language of the Trust.[3]

We acknowledge that the language in this letter reflects that Mendell had determined that *Susan* had not committed a Prohibited Act as of August 17. But,

---

[3] *See* Aug. 17 Ltr. ("[Y]our sister, [Mendell] acting as Trustee of the MK Trust No. 2, has determined in her sole discretion that you have not committed a Prohibited Act since the Effective Date of the Trust Agreement. Therefore, the distribution plan that comes into play, to be implemented at this time (following your uncle's death), is the one described in Paragraphs 6.2 (at page 6) and 8.2 (at page 24), and the remaining trust assets are to be conveyed to the new Susan Edis Gottlieb Herzfeld Trust, with one of the institutional Trustees nominated in Paragraph 9.1 (at page 26) to serve as Trustee[.]").

because under the terms of the Trust, Susan was responsible for any Prohibited Act committed by any of the Susan Herzfeld Parties (which includes appellees), it follows that for the distribution plan to be implemented as described in the August 17 letter, no Prohibited Act could have been attributed to *any* of the Susan Herzfeld Parties, including appellees. Otherwise, no distribution to Susan's trust under Section 6.2 would have taken place and, instead, distribution would have proceeded under Section 6.3.[4] Although Mendell is correct that the Trust authorizes her to determine, in her discretion, whether a Prohibited Act has occurred, Mendell's summary judgment evidence demonstrates that she had already undertaken this analysis and determined no Prohibited Act had occurred before August 17. Because the summary judgment evidence demonstrates the Mendell had determined that as of August 17 no Prohibited Act had occurred by any party, and as a result of the Disclaimer, Susan predeceased Uncle Mutt, Section 6.2 mandated that the remaining assets of the trust be distributed to appellees, as the sole beneficiaries, "outright and

---

[4]   Section 6.3 of the Trust provides for the "[a]lternative [d]istribution" "[i]f a Prohibited Act has occurred," and directs that "the Trustee shall distribute the Susan Herzfeld Share . . . to each of the following parties who have not had a Prohibited Act . . . attributed to them, as determined by the Trustee in the Trustee's sole discretion[.]" The parties entitled to receive this alternative distribution, provided that these parties did not commit a Prohibited Act, are: Jerome Michael Schneider, Laurence Scott, Rachel Chaput, Michele Alyse Schneider, Jarrod Blace Mendell, and Melissa Julia Mendell.

free of trust." The trial court therefore did not err in granting appellees' first motion for partial summary judgment.

## C.     Second and Third Partial Summary Judgment

In the trial court's second and third partial summary judgment orders, the trial court concluded that the Trust had terminated as a matter of law according to its terms and that "[b]ecause the Trust has terminated, it is impossible to commit a Prohibited Act because the legal and beneficial interests have merged to Petitioners." Below and on appeal, appellees argued that this is the correct interpretation of the Trust because:

1. The Trust provides that, if Susan fails to survive Uncle Mutt, the remaining Trust assets "shall be distributed" to appellees in equal shares "outright and free of trust";

2. During the existence of a trust, legal title to the res is in the trustee and equitable title is in the beneficiaries;

3. Upon termination, legal and equitable interests merge and the beneficiaries acquire full ownership interest in the property;

4. Upon termination of a trust, trustees retain only the limited powers necessary to wind up the affairs of the trust or to distribute the trust property in accordance with the terms of the trust; and

5. The trustee's "continued exercise of the trustee's powers after an event of termination does not affect the vested rights of beneficiaries of the trust."

Resolution of these issues requires us to determine whether the Trust has in fact terminated; if so, when; and what actions Mendell could take following termination.

20

## 1. Law Related to Termination and Merger

Section 112.052 of the Texas Property Code states:

> A trust terminates if by its terms the trust is to continue only until . . . the happening of a certain event and . . . the event has occurred. If an event of termination occurs, the trustee may continue to exercise the powers of the trustee for the reasonable period of time required to wind up the affairs of the trust and to make distribution of its assets to the appropriate beneficiaries. The continued exercise of the trustee's powers after an event of termination does not affect the vested rights of beneficiaries of the trust.

TEX. PROP. CODE § 112.052. Additionally, "a trust terminates if the legal title to the trust property and all equitable interests in the trust become united in one person." *Id.* § 112.034(b). Upon termination, trustees retain only the powers necessary to wind up the affairs of the trust or to distribute the trust property in accordance with the terms of the trust. *Sorrel v. Sorrel*, 1 S.W.3d 867, 870 (Tex. App.—Corpus Christi–Edinburg 1999, no pet.) (citing TEX. PROP. CODE § 112.052; *Nowlin v. Frost Nat'l Bank*, 908 S.W.2d 283, 289 (Tex. App.—Houston [1st Dist.] 1995, no writ); RESTATEMENT 2D OF TRUSTS § 344 (1957)). This is so because title, in effect, had already passed to the beneficiaries. *Id.* During the existence of a trust, legal title to the res is in the trustee and equitable title is in the beneficiaries. *Id.* at 871 (citing *Shearrer v. Holley*, 952 S.W.2d 74, 78 (Tex. App.—San Antonio 1997, no writ)). But, upon the termination of a trust,

> the estate of the trustee ceases, and the legal, as well as the equitable, title vests in the beneficial owner without the necessity of any act or intervention on the part of the trustee, unless the intention of the creator

appears that the legal title should continue in the trustee. The termination of a trust leaves the trustee with a mere administrative title to the fund . . . . [A]t the time of termination, the trustee is not immediately divested of all duties and responsibilities, but he has powers and duties appropriate for a winding up of trust affairs.

*Id.* at 870–71 (citation omitted).

Moreover, the property code expressly states that the trustee's powers exercised after termination shall "not affect the vested rights of beneficiaries of the trust." *See* TEX. PROP. CODE § 112.052. Courts have interpreted this language in Section 112.052 to mean that "the beneficiaries entitled to receive the trust assets upon termination automatically have vested rights upon the termination event." *Kellner v. Kellner*, 419 S.W.3d 541, 546 (Tex. App.—San Antonio 2013, pet. denied). "This merger of interests may be accomplished by an express conveyance of the legal title to the beneficiaries by the trustee upon termination of the trust, or may occur automatically upon termination of the trust 'where by the terms of the trust [it] is provided that upon expiration of the period of duration of the trust the trust property shall vest in the beneficiary.'" *Sorrel*, 1 S.W.3d at 871 (quoting *Shearrer*, 952 S.W.2d at 78). After termination the trustee has only the very limited authority given by statute, i.e., to "wind up the affairs of the trust and to make distribution." *Id.*

## 2. The Trust terminated according to its terms.

As noted above, Section 112.052 provides that a "trust terminates if by its terms the trust is to continue only until . . . the happening of a certain event and . . . the event has occurred." TEX. PROP. CODE § 112.052. In their third motion for summary judgment, appellees pointed to the following language in Section 6.2 of the Trust as evidence that it terminated upon Uncle Mutt's death: "If the said Susan Edis Gottlieb Herzfeld does not survive Settlor, and, again, conditioned upon no Prohibited Act . . . having been attributed to the Susan Herzfeld Share . . . then, instead, the Susan Herzfeld Share[5] shall be distributed to her children, Laurence Scott (Herzfeld) and Rachel Chaput, in equal shares, outright and free of trust[.]"

The crux of Mendell's argument in opposition of finding that the Trust terminated upon Uncle Mutt's death seems to be that because the Trust provided her with the discretion to determine whether a Prohibited Act occurred, no merger could have happened (and thus, no termination of the Trust), until she made that determination. She further argues that the terms of the Trust obligated her to establish reserves to defend, not only the Trust, but also Uncle Mutt's estate, and that all costs to defend the estate were to be borne by the Trust if Susan brought a challenge. While Susan disclaimed her interest in the Trust, she never disclaimed

---

[5] The Susan Herzfeld Share is defined as "the remaining trust assets of the MK Trust No. 2."

23

her interest in Uncle Mutt's estate, so the reserves had to be maintained until the applicable limitations period expired for Susan to bring a challenge to the estate. *See, e.g.*, TEX. EST. & G'SHIP CODE § 256.204(a) (two years for will contest). Mendell further contends that because Section 4.2 of the Trust Agreement mandates that the "primary purposes" for the Trust are to allow Mendell to pay from the Trust assets a one-third share of costs to defend Uncle Mutt's estate and all other final bills or debts of the estate—before any distribution is made—the Trust could not terminate or be wound up until the applicable limitations period expired.[6] So, according to

---

[6]     Section 4.2 of the Trust provides:

Primary Purposes After Death of Settlor: The primary purposes for this Trust Agreement after the death of Settlor are as follows:

(a) to allow for the Trustee to pay from the assets of the MK Trust No. 2 a one-third share of (i) all remaining legal debts of Settlor, (ii) Settlor's funeral and other burial expenses, (iii) expenses of Settlor's final illness, (iv) testamentary and administrative costs associated with Settlor's probate or nonprobate estate, (v) testamentary and administrative costs relating to the defense of Settlor's probate or nonprobate estate and (vi) any and all other final bills and/or debts of Settlor or of Settlor's probate or nonprobate estate that have not previously been paid, the remaining two-thirds shares of such costs or expenses to be borne one-third of the total of such costs and expenses each by the MK Trust No. 1 and the MK Trust No. 3, respectively;

(b) to allow for the Trustee to pay from the assets of the MK Trust No. 2 (i) administrative costs associated with any trust or trusts created under this Trust Agreement and the defense of any provision of this Trust Agreement and (ii) all other final bills and/or debts of any trust or trusts created under this Trust Agreement or of the Trustee relating to the defense of any trust or trusts created under this Trust Agreement or challenging the authority of the Trustee to act as a trustee under this Trust Agreement; and

Mendell, she would have until at least that date to investigate whether a "Prohibited Act" had occurred.

We disagree.

The Trust does not contain the explicit statement that it is to terminate upon Uncle Mutt's death; however, under the specific facts in this case, that is the effect of the distribution provision that applies in the event Susan "does not survive" Uncle Mutt. Although Susan's disclaimer occurred after Uncle Mutt's death, her disclaimer took "effect as of the time of [Uncle Mutt]'s death" and "*relates back for all purposes* to the time of [Uncle Mutt]'s death," *see* TEX. PROP. CODE § 240.051(b) (emphasis added), and the disclaimed interest passed as if she "had died immediately before" Uncle Mutt's death. *See id.* § 240.051(e)(2)(A). Thus, we must proceed to the portion of Section 6.2 which provides for distribution in the event that Susan predeceased Uncle Mutt. Although Mendell is correct that distribution to appellees was likewise "conditioned upon no Prohibited Act . . . having been attributed to the Susan Herzfeld Share," Mendell's arguments related to her ability to exercise discretion to determine whether a Prohibited Act had occurred after Uncle Mutt's death, thus preventing the termination or winding up of the Trust, all overlook the

---

(c) to provide for the disposition of the residual assets of the MK Trust No. 2, after payment or distribution, or provision for payment or distribution, of all amounts described in Section 4.2(a) and 4.2(b) above, as provided below in Section 6.2 or Section 6.3, whichever is applicable.

summary judgment evidence that she had, in fact, already made this determination as of August 17.

Furthermore, we reject Mendell's argument that the Trust could not terminate until the primary purposes under Section 4.2(a) and (b) were fulfilled. Upon Uncle Mutt's death, Section 6.1 provides for the payment of final and administrative expenses, i.e., the payment of costs and expenses identified in Sections 4.2(a) and (b). The language of Section 6.2 then provides for the distribution of the "remaining trust assets," i.e., those "residual assets" identified in Section 4.3(c), to either Susan, in trust, or if Susan predeceased Uncle Mutt, to appellees "outright and free of trust." Because Mendell had determined that as of August 17 no Prohibited Act had occurred by any party, and that she was prepared to move forward with the distributions pursuant to Section 6.2 of the Trust, albeit to Susan's trust, this necessarily means that, as of August 17, Mendell had either made "payment or distribution, or provi[ded] for payment or distribution, of all amounts described in Section 4.2(a) and 4.2(b)."[7] Accordingly, Section 6.2 directed that Mendell "shall" distribute "the remaining trust assets" to appellees "outright and free of trust."

---

[7] We note that Mendell testified later at trial that all debts of Uncle Mutt's estate had been paid, none of the payments made by Mendell from the Trust's assets after Uncle Mutt's death were made to satisfy debts of Uncle Mutt's estate, and that there was at least $50,000 in Uncle Mutt's estate account.

Thus, under the specific facts of this case, where Susan was treated as if she predeceased Uncle Mutt, the Trust was "to continue only until. . . the happening of a certain event," i.e., Uncle Mutt's death. *See* TEX. PROP. CODE § 112.052. In other words, Uncle Mutt's death was the "event of termination." *See id.* Accordingly, we conclude that the trial court correctly determined that the trust "has terminated according to its terms."

### 3. No Prohibited Act could occur after Uncle Mutt's death.

It also follows that the trial court correctly concluded that, under these facts, "[b]ecause the MK Trust No. 2 has terminated, it is impossible to commit a Prohibited Act because the legal and beneficial interests have merged to [appellees]." We have already determined that Susan could not have committed a Prohibited Act after Uncle Mutt's death because her disclaimer meant that she was considered to have predeceased Uncle Mutt and that her disclaimer was to "relate[] back for all purposes to the time of [Uncle Mutt's] death." *Id.* § 240.051(b)(1)(B). Appellees, too, could not have committed a Prohibited Act after his death because, as noted above, upon termination, the estate of the trustee ceases, and the legal, as well as the equitable, title vests in the beneficial owner without the necessity of any act or intervention on the part of the trustee. *Sorrel*, 1 S.W.3d at 870–71. Thus, once Susan disclaimed her interest in the Trust, and because Mendell had already

27

determined that no Prohibited Act had occurred,[8] the Trust dictated that the remaining assets were to be distributed to appellees outright and free of trust. This language means that both the equitable and legal title vested in appellees and no action by Mendell could displace their vested interest in that property. *See* TEX. PROP. CODE § 112.052 ("The continued exercise of the trustee's powers after an event of termination does not affect the vested rights of beneficiaries of the trust."); *Kellner*, 419 S.W.3d at 546 ("[T]he beneficiaries entitled to receive the trust assets upon termination automatically have vested rights upon the termination event."). Furthermore, the restrictions placed on potential beneficiaries of the Trust through the Prohibited Acts identified in Section 6.4 no longer applied to appellees because they were entitled to receive the assets "outright and free of trust."[9]

---

[8] Mendell also agreed during her deposition that the only Prohibited Act she was alleging appellees had committed was the filing of this lawsuit. That portion of Mendell's deposition transcript was attached as evidence to appellees' third motion for partial summary judgment.

[9] This would not be the case had Susan not disclaimed her interest, because in that case, the trust assets would have passed into her separate trust and would still be subject to the Prohibited Act provisions. *See* Trust Section 8.2 ("Any disposition pursuant to this Trust Agreement of trust assets or properties for the benefit of Susan shall be subject to the provisions of this Article VIII and other applicable provisions of this Trust Agreement. Such trust assets or properties shall not be distributed outright and free of trust. Instead, such disposition shall be made to a trust created by this Article VIII, which trust shall be named the "Susan Edis Gottlieb Herzfeld Trust[.]"); 8.3 ("For so long as no Prohibited Act . . . has been attributed to a Susan Herzfeld Party as determined by the Susan Herzfeld Trustee, in the Susan Herzfeld Trustee's sole discretion, the Susan Herzfeld Trustee shall distribute for the benefit of Susan such amounts of the income and principal of the Susan Herzfeld Trust as

Accordingly, we conclude that the trial court correctly granted summary judgment on appellees' three motions for partial summary judgment, and we overrule Mendell's first issue.

## Mendell's Individual Liability

In her second and third issues, Mendell argues that because the terms of the Trust provide that Mendell is never to be liable in her individual capacity, absent bad faith or fraud, and allow Mendell to be compensated for her services as Trustee and to use Trust assets to pay attorney's fees incurred in defense of the Trust, the final judgment awarding damages against Mendell in her individual capacity must be reversed.

### A.      Exculpatory Clause

Mendell argues that the Trust, specifically Section 10.5, unambiguously exculpates Mendell except for bad faith or fraud, for which there was insufficient evidence. Mendell contends that this provision is unenforceable only if it would exonerate Mendell for a breach of trust committed in bad faith, intentionally, or with reckless indifference to the interests of the beneficiaries, or for any profit derived by Mendell from a breach of trust. She argues that the limited exception, i.e., for bad faith, does not apply here because appellees presented neither legally nor factually

---

is necessary . . . to provide for the health, support and maintenance of Susan in her accustomed manner of living.").

sufficient evidence that Mendell's alleged acts or omissions amounted to bad faith and, further, appellees waived any contention that the exculpatory clause is inapplicable because they: (1) did not obtain summary judgment or a directed verdict that Mendell's alleged acts amounted to bad faith, and (2) did not request a jury finding on bad faith.

Appellees disagree for three reasons. First, they contend that the exculpatory clause no longer governs the relationship between the parties after the Trust terminated, i.e., at Uncle Mutt's death, so she cannot escape liability for her actions taken after Uncle Mutt's death. Second, they argue that even if we consider the applicability of the exculpatory clause, it is an affirmative defense that must be pleaded and proved by Mendell. Because she did not submit a jury question on the exculpatory clause, the issue of whether it applies is waived. Third, appellees argue that even if they, not Mendell, had the burden to submit a jury question related to the exculpatory clause, any error was harmless because the jury would have found that Mendell acted in bad faith.

### 1. Analysis

Section 10.5 of the Trust provides: "This instrument shall always be construed in favor of the validity of any act or omission of any Trustee . . . and a Trustee . . . shall not be liable for any act or omission except in case of bad faith or fraud."

The Texas Property Code provides:

(a) A term of a trust relieving a trustee of liability for breach of trust is unenforceable to the extent that the term relieves a trustee of liability for:

   (1) a breach of trust committed:

      (A) in bad faith;

      (B) intentionally; or

      (C) with reckless indifference to the interest of a beneficiary; or

   (2) any profit derived by the trustee from a breach of trust.

TEX. PROP. CODE § 114.007(a).

This court has held that an exculpatory clause is an affirmative defense. *See Kohlhausen v. Baxendale*, No. 01-15-00901-CV, 2018 WL 1278132, at *3 (Tex. App.—Houston [1st Dist.] Mar. 13, 2018, no pet.) (mem. op.) (citing TEX. R. CIV. P. 94; *Rowlett v. McMillan*, 574 S.W.2d 625, 627 (Tex. Civ. App.—Houston [14th Dist.] 1978, writ ref'd n.r.e.) (stating exculpatory clause is affirmative defense)). A party asserting an affirmative defense bears the burden to plead, prove, and secure findings on the defense. *Woods v. William M. Mercer, Inc.*, 769 S.W.2d 515, 517 (Tex. 1988). The failure to request a jury instruction on an affirmative defense results in waiver unless the issue was conclusively established. *XCO Prod. Co. v. Jamison*, 194 S.W.3d 622, 632 (Tex. App.—Houston [14th Dist.] 2006, pet. denied).

Mendell argues that it was appellees' burden, not hers, to request a jury question on the applicability of the *exception* to the exculpatory clause, i.e., that liability is not excused if actions are done in bad faith or fraud. She relies on *Texas*

31

*Commerce Bank, N.A. v. Grizzle*, 96 S.W.3d 240 (Tex. 2002), and *Kohlhausen* in support.

In *Grizzle*, the Texas Supreme Court analyzed whether an exculpatory clause relieved trustees from liability for alleged self-dealing in misapplying and mishandling trust funds, such that summary judgment in favor of the trustees on their motion was properly granted. 96 S.W.3d at 247. The court noted that the trust at issue exonerated the trustees for liability as trustee for any act or omission "except in the case of gross negligence, bad faith, or fraud." *Id.* at 251. Therefore, the court stated it was required to "decide whether [the trustees] are entitled to judgment as a matter of law because their actions did not constitute gross negligence, bad faith, or fraud." *Id.* The court then considered the trustees' arguments that their actions, at most, "constituted no more than mere failures to exercise the degree of judgment required under the circumstances," but "did not amount to gross negligence, bad faith, or fraud." *Id.* Ultimately, after considering the arguments and evidence presented by both parties, the court concluded that the plaintiff failed "to create a fact issue that [the trustee defendants] acted or failed to act as a result of gross negligence, bad faith, or fraud." *Id.* at 255. Accordingly, the court held that the trustee defendants were entitled to judgment as a matter of law on the plaintiff's individual claims against them. *Id.*

In *Kohlhausen*, this Court considered on summary judgment whether an exculpatory clause relieved a trustee from liability. The exculpatory clause at issue in *Kohlhausen* provided: "Any Executor or Trustee shall be saved harmless from any liability for any action such Executor or Trustee may take, or for the failure of such Executor or Trustee to take any action if done in good faith and without gross negligence." *Kohlhausen*, 2018 WL 1278132, at *1. This Court explained:

> A trustee may file a traditional motion for summary judgment establishing the exculpatory clause as an affirmative defense. *See Grizzle*, 96 S.W.3d at 252, 255. After the trustee establishes the existence of the exculpatory clause, the burden shifts to the nonmovant to bring forward evidence negating its applicability. *See id.* (sustaining traditional motion for summary judgment brought on exculpatory clause where beneficiary failed to create fact issue as to applicability of clause's exceptions for gross negligence, bad faith, or fraud).

*Id.* at *3. Because the defendant established that he was entitled to summary judgment as a matter of law on all of the plaintiff's claims based on the plain language of the exculpatory clause, relying on *Grizzle*, this Court stated that the plaintiff was then required to bring forth more than a scintilla of evidence creating a fact issue as to the applicability of the clause, i.e., evidence that the trustee's acts or omissions were done in bad faith or with gross negligence. *Id.* Because the plaintiff failed to do so, this court held that she "failed to meet her burden of establishing the inapplicability of the exculpatory clause to such acts or omissions." *Id.* at *4.

We find these cases distinguishable. In both of those cases, *the trustee* moved for summary judgment on the applicability of the exculpatory clause. It is undisputed

33

that Mendell did not do so here. Accordingly, as an exculpatory clause is an affirmative defense, it was her burden to prove and secure findings on that affirmative defense. *See Woods*, 769 S.W.2d at 517. The failure to do so results in waiver unless the issue was conclusively established. *XCO Prod.*, 194 S.W.3d at 632.

We do not agree with Mendell that the evidence conclusively establishes the applicability of the exculpatory clause, which exculpated Mendell from liability "for any act or omission *except in case of bad faith or fraud*." The Property Code also prohibits a trustee from being relieved from liability for a breach of trust committed in either bad faith or intentionally. *See* TEX. PROP. CODE § 114.007(a). As explained in more detail below, there was sufficient evidence to support the jury's finding that Mendell acted with malice, which required proof by clear and convincing evidence of "a specific *intent* . . . to cause substantial injury or harm" to appellees, a higher standard than bad faith.[10] TEX. CIV. PRAC. & REM. CODE §§ 41.001(7) (emphasis added), 41.003(a). Thus, the same evidence that supports the jury's malice finding supports an implied finding that Mendell acted in bad faith or intentionally. Mendell's counsel conceded as much at oral argument, agreeing that the jury's

---

[10] The pattern jury charge cited by Mendell defines "bad faith" as "an action or omission that is prompted by some improper motive rather than an honest mistake or reasonable belief that the action was probably correct." STATE BAR OF TEXAS, TEXAS PATTERN JURY CHARGES: FAMILY & PROBATE PJC 235.15 (2020).

malice finding, assuming it was supported by sufficient evidence (which he did not concede), would likely support an implied finding of bad faith because the malice standard found by the jury exceeds the standard for bad faith required by Section 114.007(a) of the Property Code. He also conceded that the jury's malice finding could be considered a finding of intent, as malice is defined as a specific intent by the defendant to cause substantial injury or harm to the plaintiff, and Section 114.007(a)(1)(B) prohibits a trustee from being relieved of liability for a breach of trust committed intentionally. *See* TEX. CIV. PRAC. & REM. CODE § 41.001(7); TEX. PROP. CODE § 114.007(a)(1)(B).

Thus, because there is sufficient evidence to support the jury's specific intent malice finding, and therefore an implied finding that Mendell committed a breach of trust in bad faith or intentionally, we conclude that the applicability of the exculpatory clause was not conclusively established by the evidence such that Mendell is excluded from all liability in her individual capacity.

We overrule Mendell's second issue.

## B. Reimbursement

Mendell also argues that the final judgment incorrectly awards appellees $200,000 in actual damages, composed of the attorney's fees that Mendell allegedly incurred and paid using Trust assets, plus $250,000 in exemplary damages against Mendell in her individual capacity. The Modified Permanent Injunction enjoins

Mendell from using Trust assets to pay or be reimbursed for attorney's fees incurred during this litigation; orders that Mendell be denied compensation for serving as the Trustee; requires her to return to the Trust any trustee compensation which she paid herself from funds or property belonging to the Trust; and orders Mendell to restore and return to the Trust any attorney's fees paid with funds or property belonging to the Trust. She contends those awards are improper on their face because the Trust Agreement grants her the express right to use Trust assets to reimburse herself, or pay for in the first instance, all attorney's fees and other expenses she incurred. She contends the Trust Agreement also gives her the right to "extraordinary compensation" for her services as Trustee and that she has a right, as a matter of law, to recover all her attorney's fees and expenses.

It is true that the Trust Agreement contains certain provisions related to reimbursement for attorney's fees and expenses, including:

- "Trustee shall also pay from the trust assets of the [Trust], all as the Trustee, in the Trustee's sole discretion, deems appropriate . . . all other final bills and/or debts . . . of the Trustee relating to the defense of any trust or trusts created under this Trust Agreement or challenging the authority of the Trustee . . ."

- The Trustee "shall be entitled to receive full reimbursement for any and all expenses . . . incurred as a result of service of Trustee under this Trust Agreement . . . out of the assets of [the Trust], including, without limitation, attorney's . . . fees . . . ."

- "[T]he Susan Herzfeld Share . . . [shall] be used for the payment of . . . as the Trustee shall determine, in the Trustee's sole discretion, all costs and expenses, including attorney's fees . . . incurred in reaction to,

and/or defense against, problems, troubles, non-cooperation, . . . litigation or other proceedings (civil or criminal), . . . whether or not such activities constitute Prohibited Acts."

While the Trust contains the above and other similar provisions, those provisions did not absolve Mendell of the duty to exercise her discretionary powers—even those that authorized her to act in her "sole discretion"—in good faith and in the interest of the beneficiaries. *See* TEX. PROP. CODE § 113.029(a) ("Notwithstanding the breadth of discretion granted to a trustee in the terms of the trust, including the use of terms such as 'absolute,' 'sole,' or 'uncontrolled,' the trustee shall exercise a discretionary power in good faith and in accordance with the terms and purposes of the trust and the interests of the beneficiaries."); *see also id.* § 111.0035(b)(4)(B) ("The terms of a trust prevail over any provision of this subtitle, except that the terms of a trust may not limit . . . a trustee's duty . . . to act in good faith and in accordance with the purposes of the trust.").[11]

Furthermore, while Texas law generally allows a trustee to incur expenses that are necessary to carry out the purposes of the trust and allows the trustee to be reimbursed from the trust estate for such expenses properly incurred, where an expense is not properly incurred, the trustee is not entitled to reimbursement from the trust estate. *See Moody Found. v. Estate of Moody*, No. 03-99-00034-CV, 1999

---

[11] This statute was amended in 2019. The citation is to the version that was in effect at the time this suit was filed.

WL 1041541, at *3 (Tex. App.—Austin Nov. 18, 1999, pet. denied) (citing RESTATEMENT (SECOND) OF TRUSTS §§ 188, 244, 245). Thus, "[a] trustee is not entitled to reimbursement for expenses that do not confer a benefit upon the trust estate, such as those expenses related to litigation resulting from the fault of the trustee." *Id.*; *see also Stone v. King*, No. 13-98-022-CV, 2000 WL 35729200, at *8 (Tex. App.—Corpus Christi–Edinburg Nov. 30, 2000, pet. denied) (mem. op.) (holding that, based on earlier conclusion that trustee breached his fiduciary duties by failing to distribute trust funds, trial court could reasonably have concluded that litigation seeking to remove trustee resulted from trustee's improper actions, that trustee did not act reasonably and in good faith in incurring attorney's fees, and was, therefore, not entitled to charge trust for fees).

Here, the jury found that Mendell breached her fiduciary duty and that she acted with malice, and we conclude these findings (as detailed below) are supported by sufficient evidence. Therefore, Mendell was not entitled to charge the Trust for fees that did not confer a benefit on the Trust and that she incurred through the fault of her own, i.e., breaches of her fiduciary duties. We therefore hold these provisions of the Trust do not render the actual and exemplary damages awarded in the final judgment and the relief awarded in the Modified Permanent Injunction improper. *See Moody Found.*, 1999 WL 1041541, at *3; *Stone*, 2000 WL 35729200, at *8; *cf. In re McIntire*, No. 07-22-00249-CV, 2023 WL 113059, at *4 (Tex. App.—Amarillo

38

Jan. 5, 2023, orig. proceeding) ("So, given the rule that 'a trustee may charge the trust for attorney's fees the trustee, acting reasonably and in good faith, incurs defending charges of breach of trust,' a finding of breach would seem a prerequisite to barring a trustee from turning to the trust for payment." (internal citation omitted)).[12]

We overrule Mendell's third issue.

## Jury Findings and Damages

In her fourth issue, Mendell argues that the trial court reversibly erred in awarding actual and exemplary damages against her for a number of reasons. First, she argues that none of the jury's findings are supported by legally or factually sufficient evidence. Second, she argues that the actual damages award is barred by the one satisfaction rule. Third, she argues the actual damages award is excessive and that remittitur is appropriate.

---

[12] Mendell also argues that the Trust directed that the payment of these fees and expenses "must be paid out of the Trust assets before any distribution is made to Appellees." However, as detailed above, we have concluded that Mendell had already, as of August 17, either made "payment or distribution, or provi[ded] for payment or distribution, of all amounts described in Section 4.2(a) and 4.2(b)." Accordingly, Section 6.2 directed that Mendell "shall" distribute "the remaining trust assets" to appellees "outright and free of trust."

## A.    Sufficiency of the Evidence to Support the Jury's Findings

Mendell argues that the trial court should vacate the awards of monetary relief to appellees because the jury's findings on both liability and damages are not supported by legally or factually sufficient evidence.

In a legal sufficiency review, we consider the evidence in a light most favorable to the jury's findings, crediting favorable evidence if reasonable jurors could, and disregarding contrary evidence unless reasonable jurors could not. *City of Keller v. Wilson*, 168 S.W.3d 802, 827 (Tex. 2005). A party that challenges the legal sufficiency of a finding on which it did not have the burden of proof must show that no evidence supports the jury's finding. *Exxon Corp. v. Emerald Oil & Gas Co., L.C.*, 348 S.W.3d 194, 215 (Tex. 2011). "Jurors are the sole judges of the credibility of the witnesses and the weight to give their testimony." *City of Keller*, 168 S.W.3d at 819. Because jurors "may choose to believe one witness and disbelieve another," we may not substitute our judgment for that of the factfinder. *Id.*

In reviewing the factual sufficiency of the evidence, we "must consider and weigh all the evidence and should set aside the judgment only if it is so contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust." *Arias v. Brookstone, L.P.*, 265 S.W.3d 459, 468 (Tex. App.—Houston [1st Dist.] 2007, pet. denied) (citing *Cain v. Bain*, 709 S.W.2d 175, 176 (Tex. 1986)). Unlike legal-sufficiency review, factual-sufficiency review requires that we review the evidence

that both supports and contradicts the jury's verdict in a neutral light. *Samson Lone Star Ltd. P'ship v. Hooks*, 497 S.W.3d 1, 11 (Tex. App.—Houston [1st Dist.] 2016, pet. denied) (citing *Cain*, 709 S.W.2d at 176). The trier of fact may choose to "believe one witness and disbelieve others" and "may resolve inconsistencies in the testimony of any witness." *Id.* (quoting *McGalliard v. Kuhlmann*, 722 S.W.2d 694, 697 (Tex. 1986)).

### 1.    Question 1: Breach of Fiduciary Duty

The jury found that Mendell breached her fiduciary duties in five different ways. In Question 1(a), the jury found that Mendell breached her fiduciary duty to administer the Trust in good faith according to its terms. In response to Question 1(b), the jury found that Mendell failed to wind up the Trust and distribute the Trust property to appellees within a reasonable amount of time after the Trust terminated. In response to Question 1(c), the jury found that Mendell breached her fiduciary duty of full disclosure to appellees. In response to Question 1(d), the jury found that Mendell breached her fiduciary duty of loyalty not to self-deal. And in response to Question 1(e), the jury found that Mendell breached her fiduciary duty of impartiality. Because we conclude that there is legally and factually sufficient evidence to support the jury's finding in Question 1(c) that Mendell breached her duty of full disclosure to appellees, and that finding fully supports the $200,000 in

actual damages awarded by the jury, we do not address Mendell's sufficiency challenges to the jury's remaining breach findings.

### a. Full Disclosure

In response to Question 1(c), the jury found that Mendell breached her fiduciary duty of full disclosure to appellees. A trustee has "a fiduciary duty of full disclosure of all material facts known to [the trustee] that might affect [a beneficiary's] rights." *Montgomery v. Kennedy*, 669 S.W.2d 309, 313 (Tex. 1984). With respect to the duty of full disclosure, the jury charge stated:

> Trustees have a fiduciary duty of full disclosure of all material facts known to them that might affect a beneficiary's or principal's right. Put another way, a trustee has much more than the traditional obligation not to make any material misrepresentations. Rather, a trustee also has an affirmative duty to make a full and accurate confession of all her trustee activities, transactions, profits and mistakes.

Mendell argues that there is legally and factually insufficient evidence to support this finding because the evidence at trial showed that appellees were provided an accounting in February 2019, which included a profit and loss statement, and that appellees received "copies of the entire picture" of the Trust assets before trial.

Although this evidence relied on by Mendell was presented, the evidence introduced at trial also reflected that Rachel asked for an accounting in September 2018 (if not before), but Rachel did not receive an accounting until February 5, 2019,

from Watler. Furthermore, Rachel described the accounting she received at that time as a "very disturbingly alarming piecemeal accounting" and "poorly done," and that it did not contain all the bank statements for the accounts. She further testified that from this "piecemeal accounting" that was provided, even though the "money trail was very . . . murky," she determined that between $45,000 and $50,000 had been "wasted out of . . . these assets." Additionally, although Rachel did testify that not long before trial she received "copies of the entire picture of what . . . assets . . . are there at this point in time," it is relevant to note that the trial took place in October 2020, over three years after Uncle Mutt died.

The jury also had before it Rachel's testimony and documentary evidence that Mendell transferred $200,000 out of the Trust's investment account into a newly-opened checking account ten days after Uncle Mutt's death, without informing appellees. The evidence, including bank statements from the investment and checking accounts and check stubs, also demonstated that Mendell engaged five different law firms over the course of three and a half years between Uncle Mutt's death and the trial, and made numerous payments to these attorneys and law firms without informing appellees. Despite Mendell purportedly conducting an investigation into whether a Prohibited Act had occurred, she never informed appellees that she was doing so. Furthermore, Mendell admitted during her testimony that she came to the conclusion—in 2017—that Susan had committed a

43

Prohibited Act by virtue of not cooperating as requested in the August 17 letter and filing her disclaimer. Yet, despite reaching this conclusion in 2017, she testified that she did not communicate this to appellees.

Nor did she provide any meaningful update or response once Rachel began reaching out directly for information and updates about the distributions. As evidenced by the emails admitted into evidence, Rachel emailed Mendell eleven times between August 2018 and January 2019. Mendell responded a total of four times.

In her first email, Rachel explained that she was notified that the investment account set up for herself and Laurence were about to expire and asked Mendell "what is causing the delay." Rachel stated that she and Laurence were upset because "[s]everal months ago we were told it'd be distributed soon." When Mendell did not respond, Rachel sent a follow up email again notifying of the impending expiration of the investment accounts and again asked for the "status of the distribution." Mendell responded as follows:

Maybe it could be simple, but it is not.

Uncle Mutt's wishes were for your mom to have the money only for support. We all know why Uncle Mutt chose to do this. I am sure you know because you and Laurence have been involved. In short, your mom was a threat to disrupt his care while he was alive and his estate later on, had threatened to sue me (directly and indirectly) and had called Adult Protective Services on me.

If at any time any of you felt that you actually wanted to move forward as a family again there had been opportunity on your part to explain your actions and maybe even apologize. It would have been nice while Uncle Mutt was alive. He was very upset that Paula and I were investigated by Adult Protective Services in Kerrville. The many interviews, not only with him, but Frances, how hurt Paula was. It was a very bad, unfair situation.

His goal was to protect me and make sure that your mom had her money to take care of her instead of spending it on legal actions. As executor of his estate I am to make sure that his wishes are executed.

You say family again.

Uncle Mutt was in the hospital for weeks and no one in your family could find the time to come and visit him. Melissa, Jarrod, Robert or I were there 95% of the time. I have never told any of you not to come and see him. When he lived in Kerrville I found the time to go almost every 3 weeks. So I understand how you have to find the time and make family important.

How do you think my son felt living in Dallas for almost 3 ½ years and never anything from your mom or you?

Yet, here you are playing the family card. But, I continue to be very focused on that. It is almost my son's wedding day. I am sure that you remember you wedding and that everyone (including me & my family) made a special time for Brian & you. I am very busy doing that for my son and his bride.

I have been working on a way to take care of the situation, but I am taking a break for Jarrod's & Chelby's wedding.


Thanks

        Aunt Joan

After receiving this email from Mendell, between September 2, 2018 and November 1, 2018, Rachel responded four more times, each time asking Mendell for information regarding the status of distributions, when Mendell would fund the investment accounts for herself and Laurence, or requesting an accounting. Mendell did not respond until November 18, 2018, stating: "Now that the Chelby and Jarrod's Wedding is behind me, I will now turn my attention to Uncle Mutt's trusts. I will be back to you soon (before 30 days)."

After Rachel did not receive a response within the 30 day period, she sent a follow up email on December 21, 2018. Mendell responded three days later:

> Attorneys for the Trust will continue to handle all communications with respect to your family. I will check with them later this week to see where they are. Please provide me with full contact information of your family's attorney (name, firm name, address, phone number, and email

address), as they will be required to handle all communications attorney to attorney as long as your family is represented by legal counsel. (Your last attorney we believe has changed, at least, law firms, so we want to make sure we have current contact information.)

Rachel responded that she did not "have an attorney and do not plan to hire one," and that attorneys for the Trust "can communicate directly with us as we can handle our own affairs."

On January 2 and 25, 2019, Rachel sent two additional emails asking for an accounting. Mendell responded on January 28 notifying Rachel that "[a]n accountant for the trust has been engaged to prepare an accounting, which will be presented to you by the attorney of the trust when it is ready." Rachel's final response reflected in the email exchanges noted her concern about "who is paying for an accountant and the attorneys you have engaged over the last 19 months for our trust alone, both of which are not really necessary given the straighforward task of distributing the trust to Laurence and me." Rachel pointed out that distributions from MK Trust Nos. 1 and 3 had been made, without the involvement of accountants and attorneys. "So unless there is more I don't know, this appears to be a deliberate runaround."

As demonstrated by these email exchanges, which occurred between August 2018 and January 2019, Mendell did not communicate to Rachel that she was in the process of trying to determine whether (or had already determined) a Prohibited Act had occurred by virtue of Susan's disclaimer and surrounding actions. Although Mendell testified that it was her understanding that her attorneys were

communicating with appellees, she admitted that she did not present the jury with any emails or letters sent by her attorneys to appellees. And Rachel testified that Mendell never told her "that there were attorneys hired with . . . these assests," and that the first time she heard that she was not going to get a distribution under the Trust was from one of Mendell's attorneys in early 2019.

It is clear that there was a history of animosity between these parties and within the extended family; however, "[t]he existence of strained relations between the parties d[oes] not lessen the fiduciary's duty of full and complete disclosure." *Montgomery*, 669 S.W.2d at 313 (failure by trustee to disclose existence of lease concealed material asset of estate). Furthermore, to the extent that there was conflicting testimony, the jury, as the sole judge of the credibility of the witnesses, could "choose to believe one witness and disbelieve another," and we may not substitute our judgment for that of the factfinder. *City of Keller*, 168 S.W.3d at 819; *see also Samson Lone Star Ltd. P'ship*, 497 S.W.3d at 11 (trier of fact may choose to "believe one witness and disbelieve others" and "may resolve inconsistencies in the testimony of any witness").

Mendell's actions detailed above, particularly failing to disclose that Mendell had determined a Prohibited Act had been committed that would prevent appellees from receiving *any* distribution under the Trust, constitute evidence of a failure to disclose material facts that might have affected the rights of the beneficiaries. *See,*

47

*e.g.*, *Estate of Benson*, No. 04-15-00087-CV, 2015 WL 5258702, at *6 (Tex. App.—San Antonio Sept. 9, 2015, pet. dism'd) (mem. op.) (holding that trustee's severance of communication with beneficiaries, his undisclosed transfer of funds that could have negatively impacted the market value of a trust asset, and his concealment of trust bookkeeper from beneficiaries constituted evidence of failure to disclose material facts that might have affected beneficiaries' rights).

Considering the evidence in a light most favorable to the jury's findings and indulging every reasonable inference to support them, we conclude there is legally sufficient evidence to support the jury's finding that Mendell breached her duty of full disclosure. *See City of Keller*, 168 S.W.3d at 827. Likewise, we conclude that the jury's finding that Mendell breached her duty of full disclosure is not so contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust and, therefore, there is factually sufficient evidence to support the jury's finding. *See Cain*, 709 S.W.2d at 176.

### 2. Question 2: Damages

In Question 2, the jury was asked "[w]hat sum of money, if any, if paid now in cash by Mendell in her individual capacity, would fairly and reasonably compensate Laurence and Rachel for the damages, if any, resulting from Mendell's conduct which you answered about in Question No. 1?" In response to the more specific question of "[w]hat is the amount of loss in the value of the Trust as a result

of [Mendell's] breach," the jury answered $200,000.

Mendell argues that there is legally and factually insufficient evidence to support this finding because there is legally and factually insufficient evidence that the Trust lost any value as a result of any alleged breach by Mendell. Finally, Mendell argues that no evidence supports the jury's finding because the terms of the Trust expressly authorized her to pay attorney's fees out of Trust assets, and the amount found by the jury—consisting of the $200,000 paid by Mendell for attorney's fees—does not represent any loss in the value of the Trust as a result of any breach.

We disagree with Mendell. As we have already determined, while the Trust contains provisions that allow Mendell to pay attorney's fees out of Trust assets, when "an expense is not properly incurred, however, the trustee is not entitled to reimbursement from the [trust]." *Moody Found.*, 1999 WL 1041541, at *3; *see also Stone*, 2000 WL 35729200, at *8 (holding that, because trustee breached his fiduciary duties by failing to distribute trust funds, trial court could reasonably have concluded that litigation seeking to remove trustee resulted from trustee's improper actions, that trustee did not act reasonably and in good faith in incurring attorney's fees, and was, therefore, not entitled to charge trust for fees).

There is sufficient evidence, as detailed above, that Mendell breached her fiduciary duty of full disclosure to appellees by not informing them of her

investigation into alleged Prohibited Acts, or her decision that a Prohibited Act had been committed and appellees would not receive any distribution under the Trust. In connection with this, and unbeknownst to appellees, Mendell transferred $200,000 out of the Trust's investment account into a no or low interest checking account and proceeded to pay attorney's fees and other expenses out of this checking account. Mendell continued to pay her attorney's fees out of this account until February 2020, when appellees received relief from the trial court in the form of a temporary injunction, which prohibited Mendell from "selling, spending, or otherwise dissipating in any way any assets belonging to the Trust, including further payment of attorney's fees or trustee compensation during the pendency of this litigation." In total, the evidence demonstrates that after Mendell transferred $200,000 from the Trust's investment account to a no or low interest checking account, she paid approximately $200,000 in attorney's fees and other expenses out of assets of the Trust, improperly and without appellees' knowledge, which is evidence of a corresponding $200,000 loss in value to the Trust.

Accordingly, considering the evidence in a light most favorable to the jury's findings and indulging every reasonable inference to support them, we conclude there is legally sufficient evidence to support the jury's finding that $200,000 represented the amount of loss in the value of the Trust as a result of Mendell's breach. *See City of Keller*, 168 S.W.3d at 827. Likewise, we conclude that the jury's

50

finding that $200,000 represented the amount of loss in the value of the Trust as a result of Mendell's breach is not so contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust and, therefore, there is factually sufficient evidence to support the jury's finding. *See Cain*, 709 S.W.2d at 176.

### 3. Question 3: Attorney's Fees

In response to Questions 3(c), 3(d), and 3(e), the jury awarded the following amounts as "reasonable fee[s] for the necessary services of [appellees'] attorney" in the Texas Supreme Court:

- $7,500 "[f]or representation at the petition for review stage";

- $12,500 "[f]or representation at the merits briefing stage"; and

- $5,000 "[f]or representation through oral argument and the completion of proceedings."

Mendell argues that no evidence supports these findings because appellees presented no evidence of the amount of their reasonable and necessary fees for representation in the Texas Supreme Court. Appellees respond that their fee expert testified referencing a demonstrative that the jury saw and used to base their award of fees, and thus, there is legally and factually sufficient evidence to support the award of appellate attorney's fees in the Texas Supreme Court. We agree with Mendell on this issue.

At trial, appellees' fee expert, while referring to a demonstrative exhibit that was not introduced into evidence, testified concerning the appellate fees in the Texas Supreme Court as follows:

> The box that's in the dark-gray . . . [t]hat is if there is a subsequent appeal to the Texas Supreme Court. And there are various levels that may – may be triggered at the Texas Supreme Court. So these numbers in red in the – what I believe to be dark gray, the dark-gray box, represent the successive phases of an appeal to the Texas Supreme Court.

Appellees' fee expert provided no further testimony as to the amount of fees sought for representation in the Texas Supreme Court, what services would be needed, or a reasonable hourly rate for those services.

In a recent Texas Supreme Court opinion, the court clarified the evidence necessary to sustain an award of contingent appellate attorney's fees. *See Yowell v. Granite Operating Co.*, 620 S.W.3d 335, 355 (Tex. 2020). The *Yowell* court explained that "with respect to contingent appellate fees, which have not yet been incurred and thus must be projected based on expert opinion testimony," "[t]here is no certainty regarding who will represent the appellee in the appellate courts, what counsel's hourly rate(s) will be, or what services will be necessary to ensure appropriate representation in light of the issues the appellant chooses to raise." *Id.* But the *Yowell* Court also held that "this uncertainty does not excuse a party seeking to recover contingent appellate fees from the need to provide opinion testimony about the services it reasonably believes will be necessary to defend the appeal and

a reasonable hourly rate for those services." *Id.* And our sister courts have reversed contingent appellate fee awards for failure to meet this *Yowell* standard. *See, e.g.*, *Rice v. Rice*, No. 02-21-00413-CV, 2023 WL 109817, at *29–30 (Tex. App.—Fort Worth Jan. 5, 2023, no pet.) (mem. op); *Ruff v. Ruff*, No. 05-21-00157-CV, 2022 WL 420353, at *11 (Tex. App.—Dallas Feb. 11, 2022, pet. denied) (mem. op.); *Jimmie Luecke Children P'ship, Ltd. v. Droemer*, No. 03-20-00096-CV, 2022 WL 243162, at *8 (Tex. App.—Austin Jan. 27, 2022, pet. denied) (mem. op.); *Milliken v. Turoff*, No. 14-19-00761-CV, 2021 WL 2156224, at *3 (Tex. App.—Houston [14th Dist.] May 27, 2021, no pet.) (mem. op.); *Porter v. Porter*, No. 04-20-00229-CV, 2021 WL 2117923, at *4–5 (Tex. App.—San Antonio May 26, 2021, no pet.) (mem. op.); *Aguilar v. Wells Fargo Bank, N.A.*, No. 07-20-00036-CV, 2021 WL 317641, at *6 (Tex. App.—Amarillo Jan. 29, 2021, no pet.) (mem. op.).

Appellees' fee expert's general testimony concerning successive phases at the Texas Supreme Court that may trigger different fees is too bare to support a conditional award of appellate attorney's fees. Although some evidence of the amounts for each level may have been contained in the demonstrative, that demonstrative is not in the record before us. *See Gen. Growth Props., Inc. v. Prop. Tax Mgmt., Inc.*, 614 S.W.3d 386, 395 (Tex. App.—Houston [14th Dist.] 2020, no pet.) ("We do not even know all of the numbers that Lemoine relied upon in calculating her estimate of lost profits: because the demonstrative aid was not

evidence, the information it contained is not in the record."). Nor did appellees' fee expert testify to *the services* necessary to defend the appeal in the Texas Supreme Court at the various stages or a reasonable hourly rate for those services. Accordingly, we conclude that because appellees' fee expert's testimony lacks the proper detail of the services to be rendered, the reasonable hourly rate for those services, or any evidence of the amount sought, the determination of appellate fees for representation before the Texas Supreme Court should be remanded to the trial court on the limited issue of attorney's fees in the Texas Supreme Court. *See Rice*, 2023 WL 109817, at *30; *Ruff*, 2022 WL 420353, at *11; *Jimmie Luecke*, 2022 WL 243162, at *8; *Milliken*, 2021 WL 2156224, at *3; *Porter*, 2021 WL 2117923, at *4–5; *Aguilar*, 2021 WL 317641, at *6.

### 4.     Questions 4 and 5: Malice and Amount of Exemplary Damages

Mendell also argues that there is legally and factually insufficient evidence to support the jury's finding that she acted with malice, and therefore, insufficient evidence to support the $250,000 exemplary damages award. Mendell asserts that she presented evidence that she believed the Trust required her to investigate whether a Prohibited Act occurred, and she did so, and that she was acting on the advice of legal counsel. Thus, there was insufficient evidence of malice. We disagree.

54

Exemplary damages may be awarded if "the claimant proves by clear and convincing evidence that the harm with respect to which the claimant seeks recovery of exemplary damages results from . . . malice." TEX. CIV. PRAC. & REM. CODE § 41.003(a)(2). Malice is defined as "a specific intent by the defendant to cause substantial injury or harm to the claimant." *Id.* § 41.001(7). Specific intent means that the actor desires to cause the consequences of his act, or he believes the consequences are substantially certain to result from it. *Reed Tool Co. v. Copelin*, 689 S.W.2d 404, 406 (Tex. 1985). Malice may be proven by direct or circumstantial evidence. *See James J. Flanagan Shipping Corp. v. Del Monte Fresh Produce N.A., Inc.*, 403 S.W.3d. 360, 369–70 (Tex. App.—Houston [1st Dist.] 2013, no pet.); *Seber v. Union Pac. R.R. Co.*, 350 S.W.3d 640, 654 (Tex. App.—Houston [14th Dist.] 2011, no pet.).

Under legal sufficiency review, when a jury makes an affirmative finding of malice, we review all the evidence in the light most favorable to the jury's finding, taking into account contrary undisputed facts, to determine whether reasonable jurors could have formed a firm belief or conviction regarding malice. *Qwest Int'l Commc'ns, Inc. v. AT & T Corp.*, 167 S.W.3d 324, 326 (Tex. 2005); *see also SW Bell Tel. Co. v. Garza*, 164 S.W.3d 607, 627 (Tex. 2004); *In re J.F.C.*, 96 S.W.3d 256, 266 (Tex. 2002). Under factual sufficiency review, we give due consideration to any evidence the fact finder could reasonably have found to be clear and

55

convincing. *In re J.F.C.*, 96 S.W.3d at 266. We must consider the disputed evidence and determine whether a reasonable fact finder could have resolved that evidence in favor of the finding. *Id.* The evidence is factually insufficient if, in light of the entire record, the disputed evidence that a reasonable fact finder could not have credited in favor of its finding is so significant that a fact finder could not have reasonably formed a firm conviction or belief. *Id.*

Here, the jury heard evidence that Mendell determined, in 2017, that Susan's actions surrounding the Disclaimer, including Susan's letter to Mendell attached to the Disclaimer, were Prohibited Acts that would disinherit Laurence and Rachel. Mendell testified that this conclusion was based on her interpretation of the Trust and was based on legal advice she received from five different law firms, whose expenses she paid for out of Trust assets. However, Mendell never communicated to Laurence and Rachel that she had made this decision. Rather, Mendell testified that it was her "impression that [her attorney] definitely let [appellees] know." Mendell, however, admitted she did not present any documentary evidence, including emails or letters, demonstrating that this information was sent by her attorneys to appellees. And Mendell admitted that she did not disclose her concerns related to Susan's letter attached to Susan's Disclaimer until *after* appellees sued Mendell and only in the course of the litigation.

Further, the jury heard evidence that Mendell never communicated this decision to Laurence and Rachel, despite receiving repeated emails and questions from Rachel asking for a status of the distribution. Although Rachel sent Mendell 12 emails over a six-month period in 2018, Mendell either did not respond to these emails or, when she finally did respond, she promised to address Rachel's concerns soon, but never did. At no time during these email exchanges did Mendell communicate her concerns about any alleged Prohibited Acts or explain why distributions had not been made.

The jury also heard evidence that Mendell never informed Laurence or Rachel that she had opened a separate checking account and transferred $200,000 to that account ten days after Uncle Mutt died, or that she had hired and was paying attorneys with those assets. Further, Mendell admitted that she has not provided any invoices describing what work was being performed by the attorneys to whom these payments were made, only that "[i]t was in defending the trust[.]"

The jury also heard Mendell's testimony that she made distributions from MK Trust No. 1, of which she was the sole beneficiary, and MK Trust No. 3 shortly after Uncle Mutt's death in 2017, despite refusing to make similar distributions from the Trust. Mendell testified that she made those distributions because MK Trust No. 1 and MK Trust No. 3 did not contain the same provisions as the Trust; however, she agreed that she had not introduced those other trust documents as evidence at trial.

Further, Rachel testified that she perceived Mendell's refusal to respond to her emails or make distributions under the Trust, while making distributions of the other two trusts "promptly," as a "deliberate runaround," "purposeful," and evidence that "there was never any intent on making any distribution," and that she felt like she "was deliberately being deceived."

There was also evidence that if the Trust was not distributed to Laurence and Rachel because a Prohibited Act had been committed, as Mendell alleged, the Trust would be divided four ways amongst Mendell's two children and the two children of Mendell's and Susan's deceased sister, Ronnie. Rachel testified that "seemingly" one of Mendell's motives for not distributing the Trust to herself and Laurence was "to give it to her children."

Finally, the jury had before it the history of animosity between Mendell and Laurence and Rachel's family. Some of that history was detailed in the provisions of the Trust agreement itself.[13] Susan's letter to Mendell attached to the Disclaimer also referred to Susan's and Mendell's relationship, stating:

> I also believe, however, Uncle Mutt's ultimate wish was for his nieces to reconcile and find a path forward together in life that wasn't

---

[13] For example, Section 6.4 of the Trust, describing the Prohibited Acts, explained that "Settlor has concerns regarding an heir of Settlor who has been causing 'trouble' through the years and that heir seems to like to use 'semantics' in denying culpability for this thing or that, so Settlor wants it to be very clear as to what various specific actions should be prohibited as a condition to receiving a benefit under this Trust Agreement."

steeped in bad feelings or resentment or involve lawyers and legal expenses.

I understand that the intention of the trust was always for my health, support, and maintenance and find everyone's contribution to help ensure that desire truly moving. But I am secure and content and feel the best thing I can do as my part in rebuilding our relationship as sisters is to remove money from our relationship entirely. The only way I see to begin this process is by disclaiming my interest allowing my share to pass according to the terms of the trust as though I predeceased Uncle Mutt. It has been recommended to me as an option, and that is the reason I have disclaimed my interest and hope we can eliminate that undue burden on you,

I am hopeful you have mutual sentiments and will work with me to find a harmonious resolution to our estrangement.

On October 10, 2017, Mendell's counsel informed Susan that Mendell was "favorably impressed" with Susan's letter and that she was interested in "any avenue that includes the Herzfelds' receiving their one-third share of Uncle Mutt's estate[.]" Yet despite this, Mendell testified that it was her "belief *at the very beginning* the problems had started by not following [Uncle Mutt's] wishes." (Emphasis added). She described the "disclaimer and the letter attached to it" as what first required her to defend the Trust "because the trust was being redirected from [Uncle Mutt's] intent." She testified that, after receiving the letter, she felt it was one of her duties as trustee to explore whether Susan was being sincere about bringing harmony to family relations, because she did not disclaim the estate. Mendell testified that she hired counsel in an effort to reach a "global," (i.e., not just limited to the Trust), "harmonious settlement," but when a harmonious settlement could not be reached within the family, she admitted that is why the money from the Trust did not go to

59

Laurence and Rachel. But when asked on cross-examination whether she was attempting to "strong-arm Rachel and Laurence into signing an unrelated settlement document they were not a part of as a condition for them receiving their inheritance," Mendell responded, "I don't perceive it that way, no." Rachel, however, testified that she did not see why she was required to sign an unrelated settlement agreement in order to receive her inheritance: "No one should withhold your inheritance from you to lord over the idea there is something else they want to accomplish."

Mendell's animosity toward Susan, as well as the appellees, is evident in her September 1, 2018 email to Rachel. Rachel had previously sent two emails asking about the delay in distribution of the Trust, noting that she was "hoping to hear a response to my email from you because you are not only my aunt, but also the executor and trustee of Uncle Mutt's estate." As set out above, Mendell's response accused Rachel of "playing the family card," and stated that "[i]f at any time any of you felt that you actually wanted to move forward as a family again there had been opportunity on your part to explain your actions and maybe even apologize. It would have been nice while Uncle Mutt was alive." She went on to describe various actions by Susan and appellees that threatened Mendell or Uncle Mutt, including alleging that Susan "threat[ened] to disrupt [Uncle Mutt's] care while he was alive and his estate later on," "threatened to sue [Mendell]," and she claimed that no one in appellees' family visited Uncle Mutt in the hospital, while Mendell, her husband, or

60

her children (the same children who were in line to receive the Trust assets if they did not go to appellees) "were there 95% of the time." Mendell further asked Rachel, "How do you think my son felt living in Dallas for almost 3 1/2 years and never anything from your mom or you?"

From all the above evidence, a reasonable juror could have formed a firm conviction or belief that Mendell, fueled by a history of animosity against Susan and her children, acted with a specific intent to harm appellees, by delaying the distribution of the assets of the Trust to them, unless or until they agreed to some other "global settlement," and when they did not, searching for a reason to conclude that they were not entitled to distribution under the Trust at all. Although Mendell argues that there is insufficient evidence of malice because appellees have no direct evidence of malice or of her intent to injure appellees, as discussed above, "it is well-established that a plaintiff required to prove the state of mind of a defendant need not adduce direct evidence; it may instead rely upon circumstantial evidence." *James J. Flanagan Shipping Corp.*, 403 S.W.3d at 369. Based on the above detailed circumstantial evidence viewed in favor of the jury's findings and the reasonable inferences drawn therefrom, combined with the fact that credibility determinations are left up to the jury, we conclude that there is legally sufficient evidence to support the jury's finding of malice. *Id.* Further, the disputed evidence is not so significant that a fact finder could not have reasonably formed a firm conviction or belief, and

therefore, we conclude there is factually sufficient evidence to support the jury's finding of malice.[14] *See In re J.F.C.*, 96 S.W.3d at 266.

## B.    One Satisfaction Rule

Mendell also argues that the $200,000 actual damages award is barred by the one satisfaction rule because it is duplicative of the relief, and is, she contends, the very same relief awarded in paragraph (iv) of the Modified Permanent Injunction. which orders Mendell to "restore[] and return[] to the Trust" "[a]ny attorney's fees that were paid with funds or property belonging to the [Trust]."

A party is entitled to sue and seek damages on alternative theories, but it is not entitled to a double recovery. *Waite Hill Servs., Inc. v. World Class Metal Works, Inc.*, 959 S.W.2d 182, 184 (Tex. 1998); *Peterson Grp., Inc. v. PLTQ Lotus Grp., L.P.*, 417 S.W.3d 46, 63 (Tex. App.—Houston [1st Dist.] 2013, pet. denied). "Under the one satisfaction rule, a plaintiff is entitled to only one recovery for any damages suffered." *Sky View at Las Palmas, LLC v. Mendez*, 555 S.W.3d 101, 106–07 (Tex. 2018) (quoting *Crown Life Ins. Co. v. Casteel*, 22 S.W.3d 378, 390 (Tex. 2000)); *see also Stewart Title Guar. Co. v. Sterling*, 822 S.W.2d 1, 7 (Tex. 1991) ("The one satisfaction rule applies to prevent a plaintiff from obtaining more than one recovery

---

[14]    The above evidence is equally sufficient to support the jury's finding in response to Question 1(a) that Mendell breached her duty to administer the Trust in good faith according to its terms. Good faith was defined in the charge as "an action that is prompted by honesty of intention and a reasonable belief that the action was probably correct."

for the same injury."). "There can be but one recovery for one injury, and the fact that . . . there may be more than one theory of liability[ ] does not modify this rule." *Tony Gullo Motors I, L.P. v. Chapa*, 212 S.W.3d 299, 303 (Tex. 2006) (quotation omitted).

As appellees concede in their brief, they have "one measure of damages, the $200,000 that [Mendell] spent out of the Trust." They admit they are not seeking recovery of $200,000 under both the final judgment and the modified permanent injunction. Rather, they are "electing to recover under the Final Judgment," and that if that judgment is upheld on appeal, "the section in the Permanent Injunction compelling [Mendell] to re-pay the Trust the $200,000 gives way." Accordingly, we agree with Mendell that appellees are only entitled to one recovery and that recovery of actual damages in the final judgment and paragraph (iv) of the modified permanent injunction are separate awards that compensate appellees for the same injury, in violation of the one satisfaction rule. *See id.* ("Chapa alleged only one injury—delivery of a base-model Highlander rather than a Highlander Limited. While she could certainly plead more than one theory of liability, she could not recover on more than one.").

We disagree, however, that this bars appellees from recovering the $200,000 in actual damages awarded in the final judgment. As the prevailing parties, appellees are "entitled to judgment on the most favorable theory supported by the pleadings,

evidence, and verdict." *Id.* at 304. For the reasons discussed in the sections above and below, we conclude there is sufficient evidence to support the full $200,000 actual damages award in the final judgment. According to Mendell's later argument in her brief challenging the trial court's modified permanent injunction, however, the trial court's award in the modified permanent injunction is overbroad because it does not limit it to those "attorney's fees or compensation received . . . that were paid with Trust funds, which were incurred after three (3) months from the effective date of Susan's Disclaimer," which is the relief appellees requested in the second amended petition. Instead, paragraph (iv) of the modified permanent injunction provides: "Any attorney's fees that were paid with funds or property belonging to the MK Trust No. 2 shall be restored and returned to the Trust."

Mendell argues that "[p]ersons seeking a permanent injunction must be specific in pleading the relief sought, and courts are without authority to grant relief beyond that so specified in the pleadings." *See Livingston v. Livingston*, 537 S.W.3d 578, 588 (Tex. App.—Houston [1st Dist.] 2017, no pet.). Accordingly, she requests that this Court modify paragraph (iv) of the modified permanent injunction "to specify that Mendell need only restore and return to the Trust those attorney's fees that were paid with funds or property belonging to the Trust and that were incurred after December 27, 2017 (three months from the effective date of Susan's Disclaimer)."

Assuming that the modified permanent injunction is overbroad in awarding more relief than requested by appellees, this would mean that appellees are entitled to *less* relief under the modified permanent injunction than they are under the final judgment. Additionally, because the jury found that Mendell acted with malice and awarded actual damages in the final judgment, appellees were also entitled to recover exemplary damages. *See* TEX. CIV. PRAC. & REM. CODE §§ 41.003(a), 41.004(a) ("[E]xemplary damages may be awarded only if damages other than nominal damages are awarded."). Exemplary damages were not ordered in the modified permanent injunction, nor are they authorized by Section 114.008 of the Property Code.

Because appellees are entitled to judgment on the most favorable theory, in this case breach of fiduciary duty, the $200,000 actual damages award in the final judgment was proper. When, as in this case, the plaintiff establishes separate theories of liability based on the same facts, and fails to elect between more than one recovery, then the appellate court should render judgment on the finding affording the greatest recovery. *Birchfield v. Texarkana Mem'l Hosp.*, 747 S.W.2d 361, 367 (Tex. 1987); *Murphy v. Seabarge, Ltd.*, 868 S.W.2d 929, 938 (Tex. App.—Houston [14th Dist.] 1994, writ denied). We therefore affirm the actual damages award in the final judgment and modify the modified permanent injunction to strike paragraph (iv).

We therefore sustain, in part, Mendell's fourth issue with respect to the application of the one satisfaction rule.

## C.      Excessiveness of Actual Damages Award

Mendell argues that the $200,000 actual damages award is excessive, warranting a remittitur, because it exceeds the amount of attorney's fees that Mendell incurred and paid using Trust assets. Mendell contends that appellees' own evidence demonstrates that the amount paid by Mendell was only $172,242.27, not the $200,000 awarded by the jury in response to Question 2.[15] She also contends that the amount awarded by the jury is excessive because it is in excess of what appellees requested in their live pleading. We disagree.

We review excessive-damages complaints as challenges to the factual sufficiency of the evidence to support the damage award and apply the same test for determining any factual-sufficiency challenge. *C.M. Asfahl Agency v. Tensor, Inc.*, 135 S.W.3d 768, 797 (Tex. App.—Houston [1st Dist.] 2004, no pet.) (citing *Maritime Overseas Corp. v. Ellis*, 971 S.W.2d 402, 406 (Tex. 1998)). We consider and weigh all the evidence and may set aside the verdict only if it so contrary to the overwhelming weight of the evidence that the verdict is clearly wrong and unjust.

---

[15]      Question 2 asked:

> What is the amount of loss in the value of the Trust as a result of the Respondent/Defendant's breach?
>
> Answer: ___$200,000___

*Id.* In considering and weighing the evidence, however, we must defer to the factfinder as final determiner of the credibility of witnesses and the weight to give their testimony. *Id.* If we conclude that the evidence is factually insufficient and that the award of damages is therefore excessive, then we must detail why we reach that result. *Id.* In that instance, this Court may suggest a remittitur. *Id.*

Mendell focuses her argument on the bank statement evidence entered as Exhibits 7 and 13 at trial. These exhibits contain bank statements from the checking account that Mendell opened shortly after Uncle Mutt's death, on June 19, 2017, with a $200,000 wire transfer. She contends that this evidence shows that Mendell only paid $172,242.27 to attorneys.[16] But this argument ignores that the evidence comprised not only these two exhibits, but also testimony from Rachel and Mendell that the loss in value to the trust, represented by the amount of money incurred by Mendell in attorney's fees and other expenses and paid for out of the Trust assets, was $200,000. For example, Rachel testified that Mendell "opened and moved money, this $200,000, straight out of this investment account that could have been making money into a checking account that [Mendell] opened up." This $200,000 was moved into a "checking account that's noninterest bearing – so it's not earning any sort of interest whatsoever." Rachel testified "all of it together," meaning the

---

[16]     Although Mendell does not explain how she reached this number, we reached this number by adding together all of the checks contained in Exhibit 13.

amount of money that was taken out of the Trust by Mendell, "is right at $200,000."

She stated numerous times in her testimony that it was the $200,000 spent by

Mendell out of the Trust that was at issue in this case. And in her testimony, Mendell

admitted that she spent around $200,000 on attorney's fees out of the Trust after

Uncle Mutt's death.

The evidence also included Exhibit 8, which reflected a "Business Premier

Money Market" account, different from the non-interest-bearing account reflected

in the bank statements in Exhibit 7. From this Money Market account, three

"Checking Withdrawal[s]" were made on July 24, 2019, totaling $52,643.10. It

appears from Exhibit 8 that a $25,000 deposit was made back into the Money Market

account on February 26, 2020, resulting in a total of $27,643.10 in withdrawals from

this account, in addition to the checks that were written out of the checking account

Mendell opened shortly after Uncle Mutt's death. Rachel described these

withdrawals in her testimony as "cash withdrawals" with no explanation as to the

purpose of these withdrawals. Rachel stated that she was "suspicious of the cash

withdrawals [Mendell] took out," but agreed that this amount was included in the

$200,000 she and Lawrence allege Mendell wrongfully expended from the Trust.

Thus, even if the checks admitted into evidence did not total $200,000, the jury had

evidence of these additional withdrawals. The amount of money withdrawn from the

Money Market account, $27,643.10, added together with the $172,242.27 in check

written out of the checking account, equals $199,885.37. Thus, the jury's damage award of $200,000 was certainly within the range of the evidence, which included documentary and testimonial evidence, presented at trial. *See Gulf States Utils. Co. v. Low*, 79 S.W.3d 561, 566 (Tex. 2002) ("[T]he jury has discretion to award damages within the range of evidence presented at trial.").

Furthermore, we disagree with Mendell that the actual damages award is excessive because it exceeds the amount requested in appellees' live pleading. Mendell contends that the excessive damages award should be restricted to only those "attorney's fees or compensation received . . . that were paid with Trust funds, which were incurred after three (3) months from the effective date of Susan's Disclaimer," because that is what was requested in the second amended petition. While she is correct that appellees requested this specific relief, they did so only in connection with their request for injunctive relief. Paragraph 36 of the second amended petition provides:

> Upon final trial of this cause, Petitioners further request that the Court issue a permanent injunction against Respondent ordering that pursuant to Texas Trust Code § 114.008 . . .
>
> (iv) Any attorney's fees or compensation received by Respondent that were paid with Trust funds, which were incurred after three (3) months from the effective date of Susan's Disclaimer shall be disgorged and returned to the Trust[.]

Appellees did not similarly limit their request for damages resulting from Mendell's breach of fiduciary duty. Instead, they alleged that a trustee who commits

69

a breach of trust "is chargeable with any damages resulting from such breach of trust, including . . . any loss or depreciation in value of the trust estate as a result of the breach of trust." Accordingly, appellees requested "any and all damages as outlined above resulting from [Mendell's] breach of trust."

Accordingly, we hold the evidence is factually sufficient to support the $200,000 actual-damages award and, therefore, remittitur is inappropriate in this case. *See Akin, Gump, Strauss, Hauer & Feld, L.L.P. v. Nat'l Dev. & Rsch. Corp.*, 299 S.W.3d 106, 124 (Tex. 2009) (court of appeals may suggest remittitur when there is insufficient evidence to support full amount of damages awarded but sufficient evidence to support lesser award); *see also* TEX. R. APP. P. 46.3.

## D. Failure to Obtain Necessary Findings to Support Exemplary Damages Award

In her final argument challenging the jury's findings, Mendell argues that appellees waived their claim for exemplary damages by not requesting or obtaining the necessary jury finding regarding the amount of exemplary damages to be assessed against Mendell for her alleged malice. She contends that because Question 5 improperly asked the jury to find the amount of exemplary damages that should be assessed against Mendell for her conduct found in response to Question 3 (the attorney's fee question) rather than Question 4 (the liability question for exemplary damages), the jury's answers to Questions 4 and 5 are immaterial, and appellees cannot recover exemplary damages against Mendell in this proceeding. We disagree.

70

Question 5 asked the jury the following:

<u>QUESTION NO. 5</u>

**If you answered "Yes" to <u>Question 4</u>, then answer this question. Otherwise, do not answer this question.**

What sum of money, if any, should be assessed against Respondent/Defendant in her individual capacity as exemplary damages for Respondent/Defendant's conduct that you found in response to Question 3?

You may consider the following factors to determine the sum exemplary damages:

- the nature of the wrong;

- the character of the conduct involved;

- the degree of culpability of the wrongdoer;

- the situation and sensibilities of the parties concerned; and

- the extent to which such conduct offends a public sense of justice and propriety.

Answer below with an amount in dollars and cents of exemplary damages awarded, if any, to Petitioners/Plaintiffs against Respondent/Defendant in her individual capacity.

**Answer:** _____ ＊250,000 _____

You are instructed that, in order for you to find exemplary damages, your answer to Question No. 5 regarding the amount of such damages must be unanimous.

<u>VERDICT CERTIFICATE</u>

**Check one:**

___✓___ Our verdict is unanimous. All 12 of us have agreed in answering Question No. 5.

_____ Our verdict is not unanimous.

Mendell is correct that Question 5 incorrectly refers back to Question 3, which asked the jury "[w]hat is a reasonable fee for the necessary services of Petitioner/Plaintiffs' attorney in this action?", when it should have referred to Question 4, which asked the jury if it found "by clear and convicing evidence that the harm to Petitioners/Plaintiffs from Respondent/Defendant's conduct resulted from malice?" However, immediately preceding, Question 5 correctly refers the jury back to Question 4, by directing the jury to answer Question 5 only if they answered

71

yes to Question 4. This Court has held in a similar circumstance that "a verdict should not be reversed based on a typographical error if the error is susceptible to commonsense detection by the jury." *Eagle Oil & Gas Co. v. Shale Expl., LLC*, 549 S.W.3d 256, 280 (Tex. App.—Houston [1st Dist.] 2018, pet. dism'd) (quotation omitted). Question 5's first conditioning instruction correctly instructed that the jury could award exemplary damages only if it found that Mendell had breached her fiduciary duty. The later incorrect reference to Question 3, which concerned an award of attorney's fees, would signal to a reasonable juror that the cross-reference was incorrect. The jury found for appellees on each of appellees' claims. On this record, there is no indication that the jury was confused as to the basis on which it awarded exemplary damages. Therefore, we hold that this typographical error was susceptible to commonsense detection and is not a basis for reversing the exemplary-damages award. *See Eagle Oil & Gas Co.*, 549 S.W.3d at 280.

As we have rejected Mendell's arguments related to the jury's findings with respect to breach, malice, and damages, we overrule the remainder of her fourth issue.

**Modified Permanent Injunction**

In her fifth issue, Mendell challenges the trial court's entry of the modified permanent injunction. In the modified permanent injunction, the trial court ordered the following:

i. Respondent Joan Gottlieb Mendell, in her capacity as trustee of the MK Trust No. 2, shall wind-up the MK Trust No. 2 within thirty (30) days of this Order and shall distribute all assets of the MK Trust No. 2 to Petitioners Laurence Scott and Rachel Chaput, in equal shares, in accordance with the Trust's terms.

ii. Respondent Joan Gottlieb Mendell, individually, and in her capacity as trustee of the MK Trust No. 2 shall be enjoined from selling, spending, or otherwise dissipating in any way any assets belonging to the Trust, including but not limited to reimbursement or further payment of attorney's fees that may have been incurred by Respondent during the pendency of this litigation;

iii. Respondent shall be denied compensation for serving as the trustee of the Trust and shall return to the MK Trust No. 2 any trustee compensation which she paid herself from funds or property belonging to the MK Trust No. 2;

iv. Any attorney's fees that were paid with funds or property belonging to the MK Trust No. 2 shall be restored and returned to the Trust. This shall not be construed in a manner that would lead to Petitioners receiving a "double recovery" of the $200,000.00 awarded in actual damages against Respondent at the October 22, 2020, jury trial in this matter.

v. Respondent shall provide a final accounting to Petitioners Laurence Scott and Rachel Chaput within thirty (30) days.

The trial court granted the modified permanent injunction pursuant to its authority under Texas Property Code Section 114.008, which provides:

(a) To remedy a breach of trust that has occurred or might occur, the court may:

(1) compel the trustee to perform the trustee's duty or duties;

(2) enjoin the trustee from committing a breach of trust;

(3) compel the trustee to redress a breach of trust, including compelling the trustee to pay money or to restore property;

73

(4) order a trustee to account;

. . .

(8) reduce or deny compensation to the trustee; [or]

. . .

(10) order any other appropriate relief.

TEX. PROP. CODE § 114.008(a).

After the trial court granted the modified permanent injunction, it issued findings of fact and conclusions of law, which are also challenged by Mendell.

We review a trial court's ruling on applications for permanent injunctions for an abuse of discretion. *Operation Rescue–Nat'l v. Planned Parenthood of Hous. & Se. Tex., Inc.*, 975 S.W.2d 546, 560 (Tex. 1998). "The trial court does not abuse its discretion when its decision is based on conflicting evidence and some evidence in the record reasonably supports the trial court's decision." *Triantaphyllis v. Gamble*, 93 S.W.3d 398, 402 (Tex. App.—Houston [14th Dist.] 2002, pet. denied).

In her first argument, Mendell contends that the findings of fact and conclusions of law are not supported by sufficient evidence, are erroneous, or are immaterial. Specifically, she challenges the evidence supporting the following findings:

- Finding 8: "Pursuant to Article 6.2 of the Trust Agreement, if Susan fails to survive Decedent, the remaining Trust assets 'shall be distributed' to her children, Rachel and Laurence, 'in equal shares, outright and free of trust.'"

74

- Finding 9: "The Trust Agreement further provides that Susan's Trust is terminated upon Susan's death."

- Finding 12: "Because of Susan's Disclaimer, the Trust should have been distributed as if Susan had failed to survive Decedent."

- Finding 17: Mendell "breached her fiduciary duty to [appellees]."

- Finding 18: Mendell "committed a breach of trust."

- Finding 19: "Such breaches were committed in bad faith, intentionally and with reckless indifference to the interest of [appellees]."

- Finding 20: Mendell "spent $200,000 out of the Trust after it terminated."

We reject Mendell's arguments challenging the sufficiency of the evidence to support the above findings based on the analysis in the previous sections of this opinion related the trial court's summary judgment rulings and the jury's findings related to breach, malice, and damages. The same evidence discussed above applies as "some evidence" to support the trial court's findings in the modified permanent injunction. We see no need to reiterate that analysis here and reject Mendell's first argument challenging the modified permanent injunction.

In her second argument, Mendell contends that paragraph (iii) of the modified permanent injunction, which orders that Mendell "shall be denied compensation for serving as the trustee of the Trust and shall return to the [Trust] any trustee compensation which she paid herself from funds or property belonging to the Trust," is not supported by any evidence because the Trust unambiguously gives Mendell the right to Trustee compensation. Even if it did not, Mendell argues, paragraph (iii)

is improper because she testified that she never paid herself any compensation as trustee. As discussed above, however, there is sufficient evidence to support the jury's findings that Mendell breached her fiduciary duty, and relatedly, the trial court's finding in the modified permanent injunction that Mendell committed a breach of trust.[17] Accordingly, Section 114.008(a)(8) authorizes the trial court "[t]o remedy a breach of trust that has occurred or might occur" by "deny[ing] compensation to the trustee." TEX. PROP. CODE § 114.008(a)(8). Thus, even if Mendell has not paid herself compensation to date, the modified permanent injunction denies her compensation going forward and is an authorized remedy under Section 114.008. Accordingly, we reject Mendell's second argument challenging the modified permanent injunction.

In her third argument, she argues that paragraph (iv) of the modified permanent injunction, which orders that "Any attorney's fees that were paid with funds or property belonging to the MK Trust No. 2 shall be restored and returned to the Trust," is overbroad because it awards appellees more relief than they sought in their live pleading. We have addressed this award in paragraph (iv) in connection with our one-satisfaction-rule analysis above and modified the modified permanent

---

[17] A breach of trust occurs when a trustee breaches his statutory or common law fiduciary duty. *Estate of Benson*, No. 04-15-00087-CV, 2015 WL 5258702, at *6 (Tex. App.—San Antonio Sept. 9, 2015, pet. dism'd) (mem. op.) (citing TEX. PROP. CODE § 114.001(b)).

injunction to remove this paragraph. Accordingly, we need not further address Mendell's argument here.

We overrule Mendell's fifth issue.

**Attorney's Fees**

In her sixth issue, Mendell argues that the trial court reversibly erred in awarding attorney's fees against Mendell in her individual capacity because the Trust unambiguously provides that Mendell is never to have any liability in her individual capacity, and that appellees themselves are to be responsible for such costs and expenses. Mendell correctly cites to Section 6.8 of the Trust, which provides:

> Settlor directs that, in no event, shall any trust of Settlor, Settlor's probate or nonprobate estate, or any Settlor Designated Representative [i.e., Mendell] . . . be responsible for payment of any costs incurred by any Susan Herzfeld Party [including appellees] . . . , including attorney's fees. Further, Settlor directs that, in no event, shall any Susan Herzfeld Party . . . be entitled to reimbursement from any trust of Settlor, from Settlor's probate or nonprobate estate, or from any Settlor Designated Representative for any costs of any Susan Herzfeld Party . . . , including attorney's fees.

Mendell argues that these and similar provisions throughout the Trust control over most statutory or common-law obligations owed by Mendell as trustee. *See* TEX. PROP. CODE § 111.0035. Therefore, she contends, these terms of the Trust preclude appellees from recovering attorney's fees under either Section 37.009 of the Texas Civil Practice and Remedies Code, which allows for the recovery of attorney's fees

77

in declaratory judgment actions, or Section 114.064(a) of the Property Code, which allows the trial court to award equitable and just attorney's fees in actions brought under the Trust Code. *See* TEX. CIV. PRAC. & REM. CODE § 37.009 ("In any proceeding under this chapter, the court may award costs and reasonable and necessary attorney's fees as are equitable and just."); TEX. PROP. CODE § 114.064 ("In any proceeding under this code the court may make such award of costs and reasonable and necessary attorney's fees as may seem equitable and just.").

We disagree. Section 111.0035 of the Property Code provides: "The terms of a trust prevail over *any provision of this subtitle*, except that the terms of a trust may not limit . . . a trustee's duty . . . to act in good faith and in accordance with the purposes of the trust[.]" TEX. PROP. CODE § 111.0035(b)(4)(B) (emphasis added). As appellees point out, while this provision dictates that the terms of a trust prevail over any provision of "this subtitle," appellees sought attorney's fees under Section 114.064 of the Property Code *and* Section 37.009 of the Texas Civil Practice and Remedies Code (the Declaratory Judgment Act). Thus, Section 111.0035 does not prohibit an award of attorney's fees pursuant to the Declaratory Judgment Act as it is not contained in the Property Code, let alone the same subtitle.

Furthermore, we have already held that the jury's findings that Mendell breached her fiduciary duties to appellees, and did so with malice, are supported by the evidence introduced at trial. We decline to hold that provisions of the Trust

78

stating that Mendell shall not be responsible for attorney's fees, even if she acted with malice, prevail over either Section 114.064 or Section 37.009. To do so when there is sufficient evidence that Mendell breached her fiduciary duties with malice, would limit Mendell's duty to act in good faith by rewarding her failure to do so.

Accordingly, we conclude that the terms of the Trust do not prevail over Section 114.064 or Section 37.009 to prohibit an award of attorney's fees. We now consider whether the attorney's fees were properly awarded under those relevant statutes. The granting or denying of attorney's fees under Section 114.064 or Section 37.009 is within the sound discretion of the trial court, and a reviewing court will not reverse the trial court's judgment absent a clear showing that the trial court abused its discretion by acting without reference to any guiding rules and principles. *See Lee v. Lee*, 47 S.W.3d 767, 793–94 (Tex. App.—Houston [14th Dist.] 2001, pet. denied) (TEX. PROP. CODE § 114.064); *Barshop v. Medina Cnty. Underground Water Conservation Dist.*, 925 S.W.2d 618, 637 (Tex. 1996) (TEX. CIV. PRAC. & REM. CODE § 37.009).

The Declaratory Judgment Act provides: "In any proceeding under this chapter, the court may award costs and reasonable and necessary attorney's fees as are equitable and just." TEX. CIV. PRAC. & REM. CODE § 37.009.  Appellees sought declaratory relief related to the interpretation of the Trust, and the trial court granted three partial summary judgments on appellees' claims for declaratory relief and

incorporated those rulings into its final judgment. These claims for declaratory relief were distinct from appellees' breach of fiduciary duty claims, and we reject Mendell's claims to the contrary. Thus, the trial court had discretion to award "reasonable and necessary attorney's fees as are equitable and just" for appellees' declaratory judgment claims. *See id.*

Section 114.064(a) of the Property Code similarly states: "In any proceeding under this code the court may make such award of costs and reasonable and necessary attorney's fees as may seem equitable and just." TEX. PROP. CODE § 114.064(a). Attorney's fees are recoverable under this statute for appellees' claims against Mendell as trustee for breaches of her fiduciary duties. *See Hachar v. Hachar*, 153 S.W.3d 138, 141–44 (Tex. App.—San Antonio 2004, no pet.) (awarding fees under Section 114.064 of the Texas Property Code in a case involving allegations regarding breach of fiduciary duty by a trustee). Thus, the trial court had discretion to award "reasonable and necessary attorney's fees as may seem equitable and just" for appellees' breach of fiduciary duty claims. *See* TEX. PROP. CODE § 114.064(a).

Mendell does not challenge the attorney's fee award as unreasonable or unnecessary; rather, she contends that the award is inequitable and unjust in light of the "unambiguous terms of the Trust Agreement by contravening Uncle Mutt's expressed intention that 'in no event' shall Mendell 'be responsible for payment of

80

any costs incurred by [appellees], including attorney's fees.'" We have already rejected this argument and concluded that the terms of the Trust do not prevail over the statutorily authorized attorney's fees in light of the evidence supporting the jury's findings that Mendell breached her fiduciary duties and acted with malice. As Mendell raises no other argument challenging the attorney's fee award as unreasonable, unnecessary, inequitable, or unjust, we hold that the trial court did not err in awarding attorney's fees under Texas Civil Practice and Remedies Code Section 37.009 and Texas Property Code Section 114.064.

We overrule Mendell's sixth issue.

## CONCLUSION

Having found insufficient evidence of appellees' conditional attorney's fees in the Texas Supreme Court, we reverse and remand to the trial court for a new trial solely to determine appropriate appellate attorney's fees in the Texas Supreme Court. We affirm the remainder of the trial court's final judgment. We modify the trial court's modified permanent injunction to strike paragraph (iv), and affirm the modified permanent injunction as modified.

Amparo Guerra
Justice

Panel consists of Justices Goodman, Hightower, and Guerra.

81